1   WILLIAM R. TAMAYO, SBN 084965 (CA)
    JONATHAN T. PECK, SBN 12303 (VA)
2   MARCIA L. MITCHELL, SBN 18122 (WA)
    SIRITHON THANASOMBAT, SBN 270201 (CA)
3   U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
    San Francisco District Office
4   350 The Embarcadero, Suite 500
    San Francisco, CA  94105
5   Telephone No. (415) 625-5640
    Fax No. (415) 625-5657
6   Sirithon.Thanasombat@eeoc.gov

7   Attorneys for Plaintiff EEOC

8

9                       UNITED STATES DISTRICT COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11                          SAN JOSE DIVISION

12   U.S. EQUAL EMPLOYMENT OPPORTUNITY          Case No.:  5:10-cv-03911- EJD
     COMMISSION,
13
                                                **PLAINTIFF EEOC'S MEMORANDUM**
14           Plaintiff,                         **OF POINTS AND AUTHORITIES IN**
                                                **OPPOSITION TO DEFENDANT'S**
15           vs.                                **MOTION FOR SUMMARY JUDGMENT**

16   ABERCROMBIE & FITCH STORES, INC. d/b/a
     ABERCROMBIE KIDS,
17                                              Date:  September 28, 2012
                                                Time:  9:00 AM
18           Defendant.                         Before:  Honorable Edward J. Davila
                                                Courtroom:  4
19

20

21

22

23

24

25

26

27

28

PLAINTIFF EEOC'S OPPOSITION TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF FACTS .................................................................................... 1

       A.    Halla Banafa's Religious Beliefs ............................................................ 1

       B.    Abercrombie & Fitch .............................................................................. 2

       C.    Halla Banafa's Application to Abercrombie............................................ 3

       D.    Comparators ............................................................................................ 7

       E.    Shifting Justifications for Ms. Banafa's Rejection from Hire ................ 8

III.   SUMMARY JUDGMENT STANDARD............................................................. 8

IV.    A REASONABLE JURY COULD CONCLUDE THAT DEFENDANT
       DISCRIMINATED AGAINST HALLA BANAFA BECAUSE OF
       HER RELIGION ................................................................................................. 10

       A.    There Is a Factual Dispute As To Whether Ms. Banafa Was Treated
             Unfavourably Because of Her Religion ................................................. 10

       B.    Defendant's Articulated Justifications For Rejection of
             Ms. Banafa are Pretextual ..................................................................... 11

             1.    Defendant's Explicit Policy Prohibiting Headwear Excluded
                   Ms. Banafa from Hire .................................................................. 12

             2.    Defendant Hired Three Less Qualified Comparators
                   Within The Same Time Period ..................................................... 12

             3.    Janet Canasa is Not Credible ...................................................... 13

             4.    Canasa's Questions About Banafa's Religion and Headscarf
                   Create an Inference of Unlawful Motive ..................................... 16

       C.    The EEOC Can Establish a *Prima Facie* Case that Defendant Failed
             to Provide Ms. Banafa with a Reasonable Accommodation...................... 16

V.     INJUNCTIVE RELIEF....................................................................................... 19

       A.    There is a Material Factual Dispute as to Whether
             Defendant Has Truly Reformed............................................................. 20

       B.    The EEOC's Claim for Injunctive Relief Is Not Overbroad.................... 21

VI.    JURY COULD EASILY AWARD PUNITIVE DAMAGES ............................. 22

VII.   CONCLUSION................................................................................................... 24

**<u>TABLE OF AUTHORITIES</u>**

**<u>Cases</u>**

*Abermarle Paper Co. v. Moody,*
    422 U.S. 405 (1975)................................................................................................ 20

*Aka v. Washington Hosp. Center,*
    156 F.3d 1284 (C.A.D.C., 1998)............................................................................. 16

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................................................ 9

*Bains LLC v. Arco Products,*
    405 F.3d 764 (9th Cir. 2005) ................................................................................. 23

*Bruso v. United Airlines,*
    239 F.3d 848 (7th Cir. 2001) ................................................................................. 21

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 325, 106 S.Ct. 2548 (1986).............................................................. 9

*Chuang v. Univ. of Cal. Davis.,*
    225 F.3d 1115, 1124 (9th Cir. 2000) ......................................................... 10, 11, 12

*Cnty. of Los Angeles v. Davis,*
    440 U.S. 625 (1979)................................................................................................ 19

*EEOC v. Abercrombie & Fitch Stores, Inc. d/b/a abercrombie Kids,*
    09-cv-602-GKF-FHM (N.D. Ok) ........................................................................... 21

*EEOC v. Accurate Mechanical Contractors, Inc.,*
    863 F.Supp. 828 (E.D. Wis. 1994)......................................................................... 19

*EEOC v. Goodyear Aerospace Corp.,*
    813 F.2d 1539 (9th Cir. 1987) ................................................................... 18, 20, 21

*EEOC v. Harris Chernin, Inc.,*
    10 F.3d 1286 (7th Cir. 1993) ................................................................................. 21

*EEOC v. Ilona of Hungary,*
    108 F.3d 1569 (7th Cir. 1997) ............................................................................. 19, 21

*EEOC v. Occidental Life Ins. Co.,*
    535 F.2d 533 (9th Cir.1976) ................................................................................... 19

*EEOC v. Premier Operator Services,*
    75 F.Supp.2d 550 (N.D. Tx.1999) ......................................................................... 20

*EEOC v.Service Temps,*
    2011 WL 5108733- (N.D. Tex.. 2010) ................................................................... 21

*EEOC v. Target*, 98 FEP Cases 1356 (7th Cir. 2006)............................................... 21

*EEOC v. Wal-Mart Stores, Inc.,*
    11 F.Supp.2d 1313 (D.N.M. 1998), *aff'd*  202 F.3d 281 (10th Cir. 1999) ................... 21

*EEOC v. White Lodging Services Corp.*,
  2010 WL 1416676 (W.D. Ky. 2010) ............................................................... 18

*Heller v. EBB Auto Co.*,
  8 F.3d 1433 (9th Cir. 1993) ........................................................................... 17

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) ....................................................................... 22

*Huff v. UARCO Inc.*,
  122 F.3d 374 (7th Cir.1997) ........................................................................... 17

*Kolstad v. Am. Dental Assoc.*,
  527 U.S. 526 (1999)................................................................................... 21, 22

*Lam v. Univ. of Haw.*,
  40 F.3d 1551 (9th Cir. 1994) ......................................................................... 10

*Lindahl v. Air France*,
  930 F.2d 1434 (9th Cir.1991) ......................................................................... 14

*Miller v. Bank of Am.*,
  600 F.2d 211 (9th Cir. 2000) ......................................................................... 22

*Norris v. City and County of San Francisco*,
  900 F.2d 1326 (9th Cir.1990) ......................................................................... 12

*Peterson v. Hewlett Packard*,
  358 F.3d 599, 603 (9th Cir. 2004) ................................................................. 10

*R.B. Ventures, Ltd. V. Shane*,
  112 F.3d 54, 59 (2nd Cir 1997)........................................................................ 9

*Raad v. Fairbanks North Star Borough School Dist.*,
  323 F.3d 1185 (9th Cir. 2003) ....................................................................... 11

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133, 151 (2000)....................................................................... 9, 12, 14

*Ross v. Brooks College*,
  2009 WL 2353262, 1 (9th Cir. 2009) ............................................................. 14

*Rowe v. General Motors Corp.*,
  457 F.2d 348 (5ᵗʰ Cir. 1972) ......................................................................... 20

*Schnidrig v. Columbia Mach., Inc.*,
  80 F.3d 1406, 1410 (9th Cir. 1996) ................................................................. 9

*Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir.1990)....................................... 17

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*,
  809 F.2d 626, 630-31 (9th Cir. 1987) ............................................................. 9

*Texas Department of Community Affairs v. Burdine*,
  450 U.S. 248, 256 (1981)............................................................................... 12

*Torgerson v. City of Rochester,*
    643 F.3d 1031, 1049 (8th Cir. 2011) .......................................................... 13

*U.S. v. City & County of San Francisco,*
    656 F. Supp. 276 (N.D. Cal. 1987) ........................................................... 20

*U.S. v. W.T. Grant Co.,*
    345 U.S. 629 (1953) ......................................................................... 18, 19

*Washington v. Garrett,*
    10 F.3d 1421, 1434 (9th Cir.1993) ........................................................... 14

**Statutes**

29 C.F.R. § 1605.2 ................................................................................ 17

42 U.S.C. § 2000e .............................................................................. 17

Fed. R. Civ. P. 56 ............................................................................. 9

## I.     INTRODUCTION

Defendant Abercrombie & Fitch Stores Inc. d/b/a abercrombie kids ("Abercrombie") refused to hire Halla Banafa because her Muslim head scarf (hijab) was "not Abercrombie look."  In moving for summary judgment, Defendant relies on the shifting testimony of an unreliable witness, the sole decision-maker, Janet Canasa.  There is ample evidence for a jury to find that Janet Canasa focused on Halla Banafa's religion and headscarf during her interview, deviated from Abercrombie's interview protocol, and dismissed her because of her religion.  There are genuine issues of material fact in this case.  Since only two people can testify as to what happened during the interview, the case inevitably will turn on credibility, a function which properly rests with a jury.  Therefore, Defendant is not entitled to summary judgment as to any of Plaintiff U.S. Equal Employment Opportunity Commission's ("EEOC") claims.

## II.    STATEMENT OF FACTS

### A.      Halla Banafa's Religious Beliefs

Halla Banafa is a Muslim.  She has been a practicing Muslim since birth.  She was raised in a Muslim family.  Ms. Banafa has attended a private Islamic school, studied the Qur'an and Arabic, and participated actively in the mosque.  (Declaration of Halla Banafa ("Banafa Decl.") ¶¶ 5-10.)

Ms. Banafa began to wear a hijab, a religious headscarf, when she was outside in public when she reached puberty.  She wore the hijab in accordance with her belief that it is required by Islam.  She derives this belief from the Qur'an and Hadith, both religious texts.  (Banafa Decl. ¶¶ 9-10, 12.)

Ms. Banafa believes that Islam also defines the clothing she should wear.  She wore and continues to wear clothing that she considers modest.  (Banafa Decl. ¶10.)  In 2008, she primarily wore jeans, shirts that covered her arms at least below the elbow, and a hijab.  Ms. Banafa was an Abercrombie customer before she decided to apply for a job.  She bought their jeans, sweatshirts, and tee shirts.  She dressed in a style that was similar to the clothes sold at Abercrombie.  (Banafa Decl. ¶13.)

In addition to wearing a hijab, Ms. Banafa is a faithful adherent of Islam in other ways.  She tries her best to pray five times a day; she performs "make up" prayers if she misses a prayer during

the day.  (Banafa Decl. ¶6.)  She observes Ramadan, the Islamic holy month, and attends services at

her mosque.  She does not drink alcohol and does not eat pork.  She taught Sunday school and

belonged to the Muslim Student Association in high school.  (Banafa Decl. ¶¶ 6-7.)  She has not yet

made a pilgrimage to Mecca, but believes the pilgrimage is required by Islam and plans to do so

when she is able.  (Banafa Decl. ¶6.)

According to Ahmed Banafa, Ms. Banafa's father, Ms. Banafa never objected to wearing a

hijab.  She wore her hijab faithfully when she was in public.  There was never a time when Mr.

Banafa observed her outside the house, in public, without a hijab.  (Declaration of Sirithon

Thanasombat ("Thanasombat Decl.") Exh. 1 [Banafa-Ah. Dep. 57:23-58:6].)  He believed it was

appropriate for Ms. Banafa to remove her hijab inside her home or inside someone else's home.

(Thanasombat Decl. Exh. 1 [Banafa-Ah Dep. 20:22 – 21:9].)

**B.      Abercrombie & Fitch**

The Abercrombie & Fitch corporation operates retail stores across the country under the

brand names Abercrombie & Fitch, Hollister, and abercrombie kids.  All three stores were

represented at the Great Mall in Milpitas, CA.  (Thanasombat Decl. Exh. 2 [Chapa Dep. 10:15-

11:5].)  The stores were managed by the same District Manager and Regional Manager.

(Thanasombat Decl. Exh. 2 [Chapa Dep. 27:20-24].)  Employees from one Milipitas Mall store

sometimes worked shifts in any of the three Abercrombie stores.  They also transferred between

stores without filling out an application.  (Thanasombat Decl. Exh. 2 [Chapa Dep. 27:20-28:3,

33:12-34:21-24].)  At times, managers for one store would hire applicants for other Abercrombie

brands.  (Thanasombat Decl. Exh. 2 [Chapa Dep. 50:8-13].)

At all times from 2005 to the present, Abercrombie has required all employees in its

Abercrombie & Fitch, Hollister, and abercrombie kids stores to comply with its "Look Policy" – a

policy that requires employees to dress in clothing that is consistent with the style of clothing sold at

the store—and employees receive  extensive training in that regard.  (Thanasombat Decl. Exh. 2

[Chapa Dep. 44:7-45:7]; Exh. 3 [Lundquist-Tulsa Dep. 46:21-47:8, 52:15-53:18, 59:7-61:3, 73:2-

17]; Exh. 4 [Yoakum Dep. 56:20-58:6].)  In 2008, the Look Policy expressly prohibited the wearing

of caps, but did not mention other forms of headwear.  Nevertheless, Abercrombie claims that all

1    headwear was prohibited. (Thanasombat Decl. Exh. 5 [Riley Dep. 141:4-12]; [RFA 13].)

2         Abercrombie provides some training on EEO laws.  (Thanasombat Decl. Exh. 4 [Yoakum

3    Dep. 264:8-19].)  It also has provided training on the Look Policy. There is not a formal process for

4    following up to see whether the trainings have been effective.  (Thanasombat Decl. Exh. 4 [Yoakum

5    Dep. 127:2-129:13]). General Manager, Adam Chapa, and Store Manager Kuulei Otis, could not

6    recall receiving any training on religious discrimination or religious accommodation.  They both

7    worked for Abercrombie as managers for three years, and Otis was promoted to a position where she

8    supervised as many as 350 employees.  (Thanasombat Decl. Exh. 2 [Chapa Dep. 9:18-24]; Exh. 6

9    [Otis Dep. 19:23-25, 48:24-51:1, 120:6-22, 152:9-153:1]).

10        Defendant's corporate Human Resources ("HR") Department is responsible for handling and

11   approving requests for exceptions to the Look Policy, including requests for religious

12   accommodation, for all of its stores and employees.  (Thanasombat Decl. Exh. 7 [RFA 16, 17].)

13   Since at least January 2008, Defendant has required its managers to contact the HR Department

14   regarding such requests.  (Thanasombat Decl. Exh. 7 [RFA 15];Exh. 5 [Riley Dep. 105:7-106:12.)

15        **C.      Halla Banafa's Application to Abercrombie**

16        On March 7, 2008, Ms. Banafa applied to work as a Part-Time Impact Associate ("PTI") at

17   the Abercrombie & Fitch brand (adult) store in the Great Mall in Milpitas, California.  (Thanasombat

18   Decl. Exh. 8 [Canasa Dep. 32:2-8; 32:20-33:7].)  PTIs are essentially entry-level, stock room

19   employees.  (Thanasombat Decl. Exh. 7 [RFA 39]; Exh. 8 [Canasa Dep. 49:21-50:12; 50:14-21];

20   Exh. 9 [Canasa ex.2 (AF_00026)].)

21        Abercrombie has a strict interview protocol called the People Selection Process (PSP) that

22   requires managers to follow a script in an Interview Guide.[1]  (Thanasombat Decl. Exh. 5 [Riley Dep.

23   64:24-66:9; 70:2-6].)  Abercrombie's structured interview system was designed to implement a

24   system for evaluating candidates in a common and consistent way, including the compliance with

25

26   [1] Defendant's Interview Guide was developed as part of the Consent Decree it entered in *Gonzalez,
     et al. v. Abercrombie, et al.,West, et al. v. Abercrombie,* and *EEOC v. Abercrombie & Fitch Stores,*
27   Civ. Nos. 03-2817-SI, 04-4730-SI, and 04-4731-SI, class actions alleging discrimination against
     African-Americans, Asians, Latinos and women.  The cases settled collectively for $50 million.
28   (Thanasombat Decl. Exh. 3 [Lundquist-Tulsa Dep. 10:18-11:9].)

PLAINTIFF EEOC'S OPPOSITION TO
DEFENDANT'S MOTION FOR                    3
SUMMARY JUDGMENT

1   anti-discrimination laws.  (Thanasombat Decl. Exh. 10 [Lundquist Dep. 44:21-48:15].)  Structured

2   interviews are counter-productive if they are used inappropriately.  (Thanasombat Decl. Exh. 10

3   [Lundquist Dep. 112:14-20].)  That is, interviewers who deviate from the interview tool gather

4   information that is not job related.  (Thanasombat Decl. Exh. 10 [Lundquist Dep. 114:21-115:22].)

5       Managers are restricted from interviewing until they have completed PSP training.

6   (Thanasombat Decl. Exh. 5 [Riley Dep. 104:20-105:6].)  Managers are trained through the PSP

7   process that it is illegal to ask an applicant about her religion.  (Thanasombat Decl. Exh. 5 [Riley

8   Dep. 81:4-82:1]; Exh. 10 [Lundquist Dep. 123:10-125:1, 129:13-21]; Exh. 7 [RFA 14, RFA 40].  If

9   religion is raised during an interview, the manager must inform the HR Department.  (Thanasombat

10  Decl. Exh. 5 [Riley Dep. 102:1-103:6].)

11      Janet Canasa started as a Manager In Training ("MIT") in the adult store on February 19,

12  2008.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 100:5-8; 123:5-7]; Exh. 7 [RFA 40].)  Abercrombie

13  transferred Canasa to work alone as an Acting Assistant Manager in the kids store two weeks after

14  she was hired and before she completed her 90-day MIT training; she did not receive further training

15  at the kids store.  (Thanasombat Decl. Exh. 8 [Canasa Dep.Dep. 39:23-24; 106:22-107:14, 108:8-

16  109:17, 110:8-10; 110:11-11:12, 115:6-8]; Exh. 11 [Canasa ex. 7 (AF-01061)].)  Canasa did not

17  complete PSP or diversity training until April 2008.  (Thanasombat Decl. Exh. 8 [Canasa Dep.

18  117:1-21]; Exh. 12 [AF_001770].)  The General Manager and Store Manager for the adult store did

19  not train her on how to conduct interviews and would not have assigned her to interview

20  independently given her level of experience.  (Thanasombat Decl. Exh. 2 [Chapa Dep. 14:7-15:15,

21  70:12-17, 60:2-14]; Exh. 6 [Otis Dep. 98:17-99:19, 99:25-100:24, 104:25-105:5, 101:16-21].)

22  Nevertheless, Canasa was given full authority to interview candidates and offer them jobs without

23  consulting a higher-level manager.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 33:19-34:2].)

24      Canasa interviewed Ms. Banafa for a position at the adult store on March 14, 2008.

25  (Thanasombat Decl. Exh. 8 [Canasa Dep. 32:2-8, 32:20-33:7].)  Ms. Banafa wore a hijab to her job

26  interview in conformity with her religious belief.  She also wore clothes she thought were consistent

27  with Abercrombie's  style: a turtleneck shirt and jeans, along with a small stud nose ring and red nail

28  polish.  (Thanasombat Decl. Exh. 13 [Banafa Dep. 108:18- 110:1; Exh. 7 [RFA 42].)  PTI applicants

1   are not evaluated on their appearance or sense of style.[2]  (Thanasombat Decl. Exh. 5 [Riley Dep.

2   86:3-13].)  Defendant's expert, Dr. Lundquist, said interviewers should not assess PTI candidates

3   based on their appearance, including hair style, jewelry or dressing in conformity with the

4   Abercrombie brand.  (Thanasombat Decl. Exh. 10 [Lundquist Dep. 110:2-110:19].)

5         Ms. Banafa interviewed for the position alone.[3]  At the beginning of the interview, Canasa

6   asked, "You're Muslim, right?"  Ms. Banafa confirmed that she was.  Canasa continued, "I thought

7   so because of your . . .", referencing Ms. Banafa's hijab by circling her face with her hand, a gesture

8   Canasa repeated during her deposition when describing Ms. Banafa's hijab.  (Banafa Decl. ¶14;

9   Thanasombat Decl. Exh. 8 [Canasa Dep. 24:14-25:20].)  Canasa also queried whether Ms. Banafa

10  was required to wear the hijab.  Ms. Banafa explained that she was.  Canasa then mentioned that her

11  father worked in Saudi Arabia and that was how she knew that not all Muslim women had to wear a

12  headscarf.  At the end of the interview, Canasa read an Interview Guide closing statement about the

13  Look Policy which did not mention the prohibition against wearing caps or head wear.

14  Nevertheless, Ms. Banafa asked if her headscarf would be a problem. Ms. Banafa told Canasa that

15  she could comply with all aspects of the Look Policy except removal of her hijab. [Thanasombat

16  Decl. Exh. 13 [Banafa Dep. 116:25-118:8-17].)  Canasa said she would check with her superior about

17  the hijab, but she never did.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 92:10-20].)  Ms.  Banafa felt

18  like the interview focused on her hijab.  (Thanasombat Decl. Exh. 13 [Banafa Dep. 119:13-19].)

19        Canasa knew that wearing headwear was prohibited by the Look Policy.  (Thanasombat

20  Decl. Exh. 8 [Canasa Dep. 127:19-24.])  There were no headscarves in Defendant's Image Book;[4]

21

22  [2] In contrast, applicants for the Model (sales associate) position are evaluated for their sense of style
    and appearance.  (Thanasombat Decl. Exh. 5 [Riley Dep. 86:4-14].)

23  [3] Canasa left the interview for a few minutes because two Model applicants showed up.
    (Thanasombat Decl. Exh. 13 [Banafa Dep. 140:21-141:13, 142:6-11]; Exh. 14 [Banafa ex. 4

24  (EEOC_000019].)  Canasa testified that her interview with Ms. Banafa was not interrupted, but there
    is an Interview Guide for two Model candidates dated the same day.  (Thanasombat Decl. Exh. 8

25  [Canasa Dep. 41:22-42:15, 168:3-170:25]; Exh. 15 [Canasa ex. 15 (AF_01173)].)  All interviews
    also are scheduled for four o'clock, the same time as Ms. Banafa's interview.  (Thanasombat Decl.

26  Exh. 8 [Canasa Dep. 34:3-13].)

27  [4] Abercrombie's Image Book is a style reference guide available for employees to make sure that
    clothing is consistent with Abercrombie brands.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 124:25-

28  126:18].)

1  Canasa had never seen employees wear headscarves; and she had never seen any head covering sold

2  at Abercrombie besides caps.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 124:25-127:7].)

3  Abercrombie requires managers to contact the HR Department whenever an individual receives a

4  passing interview score and questions about accommodations to the Look Policy, including those

5  based on disability or religion, are raised during an interview.  (Thanasombat Decl. Exh. 7 [RFA 15];

6  Exh. 5 [Riley Dep. 159:3-19].)  Canasa never contacted HR regarding Ms. Banafa's question about

7  her hijab .  (Thanasombat Decl. Exh. 8 [Canasa Dep. 92:10-14].)

8         Canasa summarized her impression of Ms. Banafa on the Interview Guide.  She observed that

9  Ms. Banafa was "not abercrombie look."  Canasa also scribbled out words on the guide which

10  appear to say something about head wear or "gear."[5]  (Thanasombat Decl. Exh. 8 [Canasa Dep. 64:6-

11  25; 82:10-18]; Exh. 16 [Canasa ex. 4].)  Deon Riley, Group Vice President of Stores, and Amy

12  Yoakum, Senior HR Managers said that Canasa should not have considered Ms. Banafa's

13  appearance in evaluating her candidacy for a PTI position.  (Thanasombat Decl. Exh. 5 [Riley Dep.

14  119:11-120:16]; Exh. 17 [Riley ex. 5]; Exh. 4 [Yoakum Dep. 281:14-283:15].)

15         Canasa also rated Ms. Banafa on three competencies required for the PTI position:

16  interpersonal interaction, work ethic, and communication skills.  Each category is ranked on a scale

17  of 1-3: "3" is outstanding; "2" is meets expectations and "1" is below expectations.  Ms. Banafa's

18  overall score of "7", including a rating of "outstanding" in interpersonal skills and "meets

19  expectations" in the communication category, qualified her for hire.  (Thanasombat Decl. Exh. 5

20  [Riley Dep. 121:19-122:8]; Exh. 8 [Canasa Dep. 95:16-96:18]; Exh. 16 [Canasa ex. 4].)  Candidates

21  who interview alone and who meet or exceed expectations should be offered a position.

22  (Thanasombat Decl. Exh. 10 [Lundquist Dep. 126:4-128:14].)  If more than one candidate passes the

23  interview, the higher scored candidate should be hired.  (Thanasombat Decl. Exh. 8 [Canasa Dep.

24  159:10-21; 164:12-165:17]; Exh. 18 [Canasa ex. 14 (pages 000674-675 only)].)

25         Canasa decided not to hire Ms. Banafa after she rated the interview.[6]  (Thanasombat Decl.

26  _____

[5] The original Interview Guide was destroyed by Abercrombie and not available for inspection.  This
is a violation of recordkeeping requirements under 29 CFR 1602.14.

27

28  [6] According to Defendant, if Abercrombie does not call a candidate back within a week, then they
are admitted not hired.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 93:23-94:4].)

1   Exh. 8 [Canasa Dep. 49:2-10]; Exh. 7 [RFA 44].)  Canasa did not consult with Adam Chapa, the

2   General Manager of the Abercrombie & Fitch (adult) store – or anyone else—before rejecting Ms.

3   Banafa's application for the adult store.  (Thanasombat Decl. Exh. 2 [Chapa Dep. 50:25-51:4, 68:17-

4   69:7]; Exh. 8 [Canasa Dep. 33:19-34:2].)  Abercrombie requires Managers to record the reasons for

5   an employee's selection or non-selection, including availability, on an electronic Applicant

6   Management System (AMS).  (Thanasombat Decl. Exh. 8 [Canasa Dep. 73:18-74:2].)  Canasa did

7   not record her reason for rejecting Ms. Banafa's application to the AMS system.  (Thanasombat

8   Decl. Exh. 8 [Canasa Dep. 97:23-98:4].)

9         **D.    Comparators**

10         Applications are active for thirty days.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 94:10-15].)

11   The Abercrombie kids and adult stores hired twelve PTIs in the 30-day period that Ms. Banafa's

12   application was active, none of whom wore a hijab.  (Thanasombat Decl. Exh. 19 [excerpt from

13   EEOC-000288-301]; Exh. 20 [excerpt from EEOC_000321-324]; Exh. 7 [RFA 18].)  Three of these

14   candidates, Gregory Lopez, Lindsay Royola, and Andy Sim, all scored "6" on their interviews.

15   (Thanasombat Decl. Exh. 21 [AF_001108]; Exh. 22 [Canasa ex. 17 (AF_001121)]; Exh. 23

16   [EEOC000380].)  Managers at the adult store did not reject candidates based on availability.

17   (Thanasombat Decl. Exh. 2 [Chapa Dep. 40:15-41:4]; Exh. 6 [Otis Dep. 144:1-145:6].)  A week

18   before Ms. Banafa applied, the adult store hired Tan Duy Mai to work as a PTI on weekends only.

19   (Thanasombat Decl. Exh. 31[EEOC_000332]; Exh. 20 [excerpt from EEOC_000321-324].)  Three

20   times as many PTIs are required to work over the weekend than during the work week.[7]

21   (Thanasombat Decl. Exh. 2 [Chapa Dep. 65:8 – 66:4]; Exh. 6 [Otis Dep. 159:15-160:2].)  Canasa

22   does not remember selectees Jessica Baron, Argenis Lopez or Kirk Saecho and thus has no

23   foundation to testify as to the reason for they were hired.  (Thanasombat Decl. Exh. 8 [Canasa Dep.

24   206:2-10].)

25

26   _____

27   [7] Canasa told the EEOC that Aberccrombie was "always hiring . . . . Because part-time associates
     only work 5-10 hours per week and we have a huge turnover, there's always a lot of availability."

28   (Thanasombat Decl. Exh. 24 [Canasa 2/23/10 Interview at EEOC_000251]; Exh. 8 [Canasa Dep.
     195:13-24]).

**E.     Shifting Justifications for Ms. Banafa's Rejection from Hire**

Canasa submitted two declarations to the EEOC in July 2008 in response to Ms. Banafa's charge and never mentioned availability as her justification for rejecting Ms. Banafa.. (Thanasombat Decl. Exh. 25 [Canasa ex. 18 (7/11/08 Dec., AF_00020)]; Exh. 34 [Canasa ex. 19 (7/24/08 Dec., AF_00022)].) Canasa told an EEOC investigator two years later that she did not hire Ms. Banafa "because she was not very outgoing, confident." (Thanasombat Decl. Exh. 24 [Canasa 2/23/10 Interview at EEOC_000251].) Abercrombie's written submissions during the EEOC investigation also focused on Ms. Banafa's demeanor. (Thanasombat Decl. Exh. 26 [3/15/10 A&F Letter (EEOC_000239)].) Four years after Ms. Banafa's interview, Canasa testified for the first time that she rejected Ms. Banafa because of her limited availability. (Thanasombat Decl. Exh. 8 [Canasa Dep. 60:10-21].) (Docket # 76-8 [Canasa 7/26/12 Dec.].) She couldn't explain why she had only told the EEOC about Ms. Banafa's demeanor. (Thanasombat Decl. Exh. 8 [Canasa Dep. 194:13-195:8].) Defendant then supplemented its interrogatory responses after Canasa's testimony to add "availability" as the reason she was not selected. (Thanasombat Decl. Exh. 27 [Defendant's Verified Response to 1st Requests for Production and Interrogatories, Interrogatory No. 2]; Exh. 28 [Defendant's Verified Supplemental Response to 1st Set of Interrogatories, No. 2].)

**F.     Defendant's Related Religious Accommodation Cases**

In July 2011, the Northern District of Oklahoma found Abercrombie liable for refusing to accommodate and refusing to hire Samantha Elauf, a Muslim applicant who wore a hijab. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 4:09-cv-00602-GKF-FHM (hereinafter "*Elauf lawsuit*"). Abercrombie argued that allowing Ms. Elauf to wear a hijab violated its Look Policy and that permitting Ms. Elauf to wear a hijab would cause an undue hardship on its business operations. The court granted summary judgment to the EEOC on the merits, holding that Abercrombie could not prove undue hardship as a matter of law. Defendant appealed. (Thanasombat Decl. Exh. 29 [10th Cir., Appellate Case: 11-5110, Document: 01018688252, filed 8/4/2011].)

**III.     SUMMARY JUDGMENT STANDARD**

A party is entitled to summary judgment if it can establish that no material facts are in dispute, and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party must

1   show the absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct.

2   2548 (1986).

3          Furthermore, in assessing the record to determine if such issues exist, all ambiguities and all

4   inferences must be resolved in favor of the plaintiff as the non-moving party. *Anderson v. Liberty*

5   *Lobby, Inc.* 477 U.S. 242, 255 (1986); *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 978 (10th Cir.

6   2008).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

7   inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255.

8          "Thus, although the court should review the record as a whole, it must disregard all evidence

9   favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson*

10  *Plumbing Products, Inc.* , 530 U.S. 133, 151 (2000)(citing 9A C. Wright & A. Miller, Federal

11  Practice and Procedure § 2529, pp. 299 (2d ed.1995)).  "That is, the court should give credence to

12  the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is

13  uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested

14  witnesses." *Reeves*, 530 U.S. at 151 (internal citations omitted).  "If reasonable minds could differ

15  as to the import of the evidence … and if there is any evidence in the record from any source from

16  which a reasonable inference in the nonmoving party's favor may be drawn, the moving party

17  simply cannot obtain summary judgment." *R.B. Ventures, Ltd. V. Shane,* 112 F.3d 54, 59 (2nd Cir

18  1997) (internal citations and quotations omitted); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors*

19  *Ass'n.*, 809 F.2d 626, 630-31 (9th Cir. 1987).

20         The Ninth Circuit "has set a high standard for the granting of summary judgment in

21  employment discrimination cases." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.

22  1996) (internal quotations omitted).  The Ninth Circuit has stressed that it will "require very little

23  evidence to survive summary judgment" in employment discrimination cases because the "ultimate

24  question is one that can only be resolved through a 'searching inquiry' - one that is appropriately

25  conducted by a factfinder on the full record." *Chuang v. Univ. of Cal. Davis.*, 225 F.3d 1115, 1124

26  (9th Cir. 2000); *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1564 (9th Cir. 1994) (internal quotation

27  omitted).  "The existence of an intent to discriminate may be difficult to discern in depositions

28  compiled for purposes of summary judgment, yet it may later be revealed in the face-to-face

PLAINTIFF EEOC'S OPPOSITION TO
DEFENDANT'S MOTION FOR                                9
SUMMARY JUDGMENT

1  encounter of a full trial." *Lam*, 40 F.3d at 1564.

2  **IV.   A REASONABLE JURY COULD CONCLUDE THAT DEFENDANT**
         **DISCRIMINATED AGAINST HALLA BANAFA BECAUSE OF HER RELIGION**
3

4         This case hinges on the credibility of two witnesses, Halla Banafa and Janet Canasa.  They

5  are the only two people who know what occurred during the interview.  As Defendant concedes, Ms.

6  Banafa and Canasa's versions of what happened at the interview diverge significantly.  (Docket #75

7  [Def's MSJ, p. 12].)   The outcome of the case will inevitably turn on credibility, a determination

8  which properly rests with a jury.  On this basis alone, Defendant's motion should be denied.

9         **A.   There Is a Factual Dispute As To Whether Ms. Banafa Was Treated**
              **Unfavourably Because of Her Religion**
10

11        Title VII prohibits employers from failing to hire individuals based on their religion.  To

12 establish a *prima facie* case of disparate treatment, the EEOC must show that:  (1) Ms. Banafa

13 belongs to a protected class, i.e., is Muslim; (2) she applied for and was qualified for the position; (3)

14 she was rejected for employment; and (4) similarly situated individuals outside her protected class

15 were treated more favorably or **other circumstances surrounding the adverse employment action**

16 **existed which give rise to an inference of discrimination**.  *Peterson v. Hewlett Packard*, 358 F.3d

17 599, 603 (9th Cir. 2004) (emphasis added).  Once the EEOC establishes a *prima facie* case,

18 Defendant must articulate a non-discriminatory reason for rejecting Ms. Banafa.  The EEOC will

19 prevail if it can establish that Defendant's proffered reasons were a pretext for discrimination.

20 *Chuang*, 225 F.3d at1123-24.

21        Drawing all inferences in favor of the plaintiff, several facts could lead a jury to conclude

22 that the EEOC has a *prima facie* case.  Ms. Banafa is Muslim..  Ms. Banafa participated in an

23 interview that centered around her  hijab.  (Thanasombat Decl. Exh. 13 [Banafa Depo 119:13-24].)

24 Canasa, who knew that headwear was prohibited by the Look Policy, asked whether Ms. Banafa

25 could remove her hijab, and when Ms. Banafa said she could not, pointed out that she knew Muslim

26 women who did not wear hijabs.  In addition, Ms. Banafa received a passing interview score and as

27 the only PTI candidate at the time, should have been hired under Defendant's policies.  There is

28 evidence that Canasa did not compare Ms. Banafa to any other applicant before rejecting her.  She

1   did not interview or remember Jessica Baron, Argenis Lopez, and Kirk Saechao.  (Thanasombat

2   Decl. Exh. 8 [Canasa Dep. 206:2-10].)   Ms. Banafa also received a higher interview score than three

3   candidates who were ultimately hired.  These successful candidates did not wear a hijab.  There is

4   ample evidence for a jury to conclude that Ms. Banafa was treated less favorably than similarly

5   situated candidates or that there were other circumstances giving rise to an inference of

6   discrimination.

7          Moreover, whether candidates are similarly situated is a question of fact which "cannot be

8   mechanically resolved."  *Earl v. Nielsen Media Research, Inc.,* 658 F.3d 1108, 1114 (9th Cir. 2011).

9   The determination "is not an unyielding, inflexible requirement that requires near one-to-one

10  mapping between employees."  *Id.,* quoting .  *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 405

11  (7th Cir. 2007).  Thus, Abercrombie has drawn the comparison too narrowly.  This is an issue for the

12  jury to decide.

13         In addition, to accept that Ms. Banafa's availability even factored into the hiring decision,

14  one must deem Canasa credible. This is a determination only the jury can make.  Moreover,

15  Defendant's focus on the combination of availability plus interview score is a red herring.  Adam

16  Chapa and Store Manager, Ku'ulei Otis did not consider availability before making a hiring

17  decision.  Since Canasa claims they were the only people who trained her on how to interview, a jury

18  could conclude that she was trained to make hiring decisions without considering a candidate's

19  availability, particularly since she was interviewing Ms. Banafa for a job at the adult store.

20         **B.      Defendant's Articulated Justifications For Rejection of
                     Ms. Banafa are Pretextual**

21

22         A plaintiff can survive summary judgment by adducing evidence that raises a material issue

23  of fact as to whether the defendant acted with discriminatory animus, or that its proffered

24  explanation is pretextual.  *Raad v. Fairbanks North Star Borough School Dist.,* 323 F.3d 1185, 1196

25  (9th Cir. 2003) (internal citation omitted); *Chuang ,* 225 F.3d at 1127; *Texas Department of*

26  *Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981).  A plaintiff "can prove pretext in two

27  ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence'

28  because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that

1   unlawful discrimination more likely motivated the employer." *Chuang*, 225 F.3d at 1127.  These

2   two approaches are not exclusive; a combination of the two kinds of evidence may serve to establish

3   pretext.  *Id.*  The Ninth Circuit also has held "the plaintiff is required to produce 'very little' direct

4   evidence of the employer's discriminatory intent to move past summary judgment."  *Id.* at 1128

5   (internal citations omitted).  The jury can "infer the ultimate conclusion of discrimination from the

6   falsity of the employer's explanation."  *Reeves,* 530 U.S. at 147.  Other factors to consider in

7   determining pretext include the information known to the defendant at the time of the adverse

8   employment decision, the plausibility of the explanations offered, and any inconsistencies within the

9   explanations offered.  *Norris v. City and County of San Francisco*, 900 F.2d 1326, 1331 (9th

10  Cir.1990).

**1.  Defendant's Explicit Policy Prohibiting Headwear Excluded
Ms. Banafa from Hire**

13          There is sufficient evidence for a rational jury to conclude that Defendant's eleventh-hour

14  justification for refusing to hire Ms. Banafa is pretextual.  The evidence reveals that Canasa honed in

15  on Ms. Banafa's religion and hijab on the day of the interview, highlighting in the Interview Guide

16  that she was "not abercrombie look".  As a recent hire, Canasa had been trained that it was critical

17  for employees to depict Abercrombie's brand and that she should consult Image Books as a guide for

18  Abercrombie styling.  The Image Books did not depict employees wearing caps or headscarves.  Nor

19  had she seen any employees wearing any headwear.  She knew that Abercrombie's Look Policy was

20  of utmost importance and that it prohibited employees from wearing caps or other headwear.

21  (Thanasombat Decl. Exh. 8 [Canasa Dep. 130:12-131:13]; Exh. 5 [ Riley Dep. 141:16-142:7;

22  143:11-145:16].)  A fact-finder can deduce that Canasa was fixated on Ms. Banafa's hijab at the

23  interview and rejected her because of it.

**2.  Defendant Hired Three Less Qualified Comparators
Within The Same Time Period**

26          There is a material factual dispute as to which store Ms. Banafa applied and therefore, as to

27  whom she should be compared.  Drawing inferences for the EEOC, a jury will likely conclude that

28  Ms. Banafa applied and was considered for a job at the adult store.  (Thanasombat Decl. Exh. 30

1   [Canasa ex. 3]; Exh. 8 [Canasa Dep. 32:2-8].)  Availability was not a factor for hire at the adult

2   store.  (Thanasombat Decl. Exh. 2 [Chapa Dep. 40:15-41:4]; Exh. 6 [Otis 144:1-145:6].)  Only one

3   week before Ms. Banafa's interview, the adult store hired Tan Duy Mai for a PTI position.  She and

4   Ms. Banafa had identical availability: they could work on Friday, Saturday, and Sunday, but yet, Mai

5   was hired on the very same day as her interview.  (Thanasombat Decl. Exh. 31 [Mai Appl.

6   (AF_02242)]; Exh. 20 [2008 PTI List at EEOC 324].) .  Moreover, the adult store needed "lots" of

7   PTIs and preferred candidates with weekend availability.  (Thanasombat Decl. Exh. 2 [Chapa Dep.

8   65:8 – 66:4]; Exh. 6 [Otis Dep. 159:15-160:2].)

9         In addition, since Abercrombie hired candidates with lower scores than Ms. Banafa, a

10  reasonable jury could use this evidence to infer that Defendant's thin excuse about interview scores

11  and availability is pretextual.  PTIs Lindsay Royola, Andy Sim, and Gregory Lopez were

12  interviewed two weeks after Ms. Banafa, and they each received a score of "6."  It is Abercrombie's

13  policy to hire candidates who receive passing scores, and if there is more than one candidate in the

14  pool, the candidate with the highest score is selected..  (Thanasombat Decl. Exh. 8 [Canasa Dep.

15  159:13-21, 164:12-165:7]; Exh. 18 [Canasa ex. 14 (PSP Training Protocols at Tulsa-AF 000675)].)

16  Under both scenarios, a jury could decide that Ms. Banafa should have been hired.  Moreover,

17  Abercrombie managers are directed to consider diversity whenever there was a tie between

18  candidates.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 164:12-165:7]; Exh. 18 [Canasa ex. 14 (PSP

19  Training Protocols at Tulsa-AF 000674-675)].)  As a Muslim woman wearing a hijab, Ms. Banafa

20  certainly would have added diversity to the workforce.

21         Defendant cited to *Torgerson v. City of Rochester*, 643 F.3d 1031, 1049 (8th Cir. 2011), for

22  the claim that employers are entitled to compare applicants' performance during interviews.

23  *Torgerson* is inapplicable for several reasons: (1) there is substantial evidence of discriminatory bias;

24  (2) unlike the *Torgerson* plaintiffs, Ms. Banafa received a *higher* interview score than candidates

25  who got job offers; and (3) Canasa never compared Ms. Banafa's interview performance to other

26  applicants.

27         **3.  Janet Canasa is Not Credible**

28         Defendant's motion hinges on Canasa's most recent version of her justification for rejecting

1  Ms. Banafa.  The very fact that Canasa has provided several different justifications for her actions is

2  evidence of pretext. These shifting explanations create a genuine issue of fact since they suggest the

3  possibility that neither explanation was true.  *Ross v. Brooks College,* 2009 WL 2353262, *1 (9th

4  Cir. 2009), *citing Washington v. Garrett,* 10 F.3d 1421, 1434 (9th Cir.1993); *Lindahl v. Air France,*

5  930 F.2d 1434, 1438-39 (9th Cir.1991) (finding dispute of material fact where reasons for discharge

6  were unsupported by the facts and not articulated until the litigation commenced).  Her credibility

7  should be determined by a jury.  *See Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 255.

8       There are multiple additional indicators that Canasa has lied.  Canasa submitted her first and

9  freshest account of her interview with Ms. Banafa four months later when she submitted a sworn

10  statement to the EEOC.  (Thanasombat Decl. Exh. 25 [Canasa ex. 18].)  She understood that she was

11  participating in a federal investigation and the information provided needed to be accurate and

12  complete.  She never mentioned Ms. Banafa's availability.  Concerned about the completeness of her

13  earlier submission, Canasa submitted a supplemental declaration two weeks later.  Again, she said

14  nothing about Ms. Banafa's availability.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 192:1-194:12].)

15  Defendant failed to raise Ms. Banafa's availability in correspondence with the EEOC, pinpointing

16  instead on the claim that she was"not sufficiently outgoing and engaging" and "spoke in a quiet tone

17  and had to be asked to repeat herself."  (Thanasombat Decl. Exh. 26 [A&F 3/15/10 Letter

18  (EEOC_000239)].)  Two years later Canasa was interviewed by an EEOC Investigator.  Again, she

19  never mentioned Ms. Banafa's availability, but rather focused on Ms. Banafa's demeanor.

20  Defendant failed to raise availability as a justification when it responded to the EEOC's first

21  interrogatories.  Four years after Ms. Banafa was interviewed and had filed her EEOC charge,

22  Canasa was deposed and "remembered" that she didn't hire Ms. Banafa because of her availability.

23  She had no explanation for why she hadn't mentioned it sooner.  Defendant seized on this newly

24  crafted defense and raced to supplement its interrogatory responses to add "availability" as the

25  reason Ms. Banafa wasn't selected.  Canasa's propensity to change her story each time it suits her is

26  a sufficient basis to send the case to the jury.

27       There are multiple other reasons to disbelieve Canasa's account of her interview with Ms.

28  Banafa.  She denied telling Ms. Banafa that her father had lived for almost half his life in Saudi

1    Arabia, but Ms. Banafa had no other source for this information.  (Thanasombat Decl. Exh. 13

2    [Banafa Dep. 157:13-158:1]; Exh. 8 [Canasa Dep. 23:19-25].)  She denied knowing that headscarves

3    could be worn for religious purposes, but admitted that her father converted to Islam when she was a

4    teenager.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 16:22-17:24, 17:25-18:8, 20:11-21:8, 18:19-

5    21].)  Canasa denied having seen any photographs of Muslim women wearing headscarves (not even

6    in the media, on the Internet, or on the news), but conceded that she had seen reports about Muslims

7    in reference to the wars in Iraq and Afghanistan.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 21:13-

8    19, 21:20-22:24].)  She denied being interrupted during the interview in order to greet two Model

9    applicants (information chronicled by Ms. Banafa), while admitting that she interviewed two Model

10   candidates that same day.  (Thanasombat Decl. Exh. 32 [Banafa Intake Questionnaire

11   (EEOC_000019)]; Exh. 8 [Canasa Dep. 167:25-169:1].)  These material facts bear directly on Ms.

12   Canasa's credibility.[8]

13        Someone is being untruthful, and all indicators point to Canasa.  A jury can infer from

14   Canasa's testimony that her explanation is not only a mistaken one, but a lie.  The jury can conclude

15   that an employer who fabricates a false explanation has something to hide; that "something" may

16   well be discriminatory intent.  *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1293 (C.A.D.C.,

17   1998) (citations omitted).  Drawing inferences in favor of the EEOC, this case cannot be resolved on

18   summary judgment. *Reeves*, 530 U.S. at 150.

19

20

21   ───────────────

22   [8]  By contrast, Ms. Banafa has been consistent and credible.  She prepared a contemporaneous
     written statement that is consistent with independent facts and her testimony.  (Thanasombat Decl.
23   Exh. 13 [Banafa Dep. 121:18-122:3,123:2-12; 140:21-141:13]; Exh. 14 [Banafa ex. 4
     (EEOC_000019)].).  For example, Ms. Banafa noted that Canasa stepped out for a few minutes
24   during their interview and later explained that female Model applicants were waiting to be
     interviewed for a Model position.  (Thanasombat Decl. Exh. 32 [Banafa Intake Questionnaire
25   (EEOC_000019)].)  Janet Canasa in fact interviewed two Model applicants the same day.
     (Thanasombat Decl. Exh. 8 [Canasa Dep. 168:17-171:24]; Exh. 15 [Canasa ex. 15].)  Ms. Banafa
26   also noted that Canasa had circled her face with her right hand when asking Ms. Banafa about her
     headscarf.  (Thanasombat Decl. Exh. 13 [Banafa Dep. 116:2-117:32].)  Unprompted during her
27   deposition, Canasa circled her face when describing Ms. Banafa's headscarf.  (Thanasombat Decl.
     Exh. 8 [Canasa Dep. 24:13-24].)  The interview questions and answers in her chronology matched
28   the ones on the interview guide.  *Cf.* interview guide and, significantly as discussed above, Ms.
     Banafa learned from Canasa that Canasa's father had lived in Saudi Arabia.

### 4. Canasa's Questions About Banafa's Religion and Headscarf Create an Inference of Unlawful Motive

In arguing that Canasa could not have discriminated because she followed the interview protocols, Defendant has ignored facts which, if considered by the jury, could compel a conclusion that Canasa engaged in intentional discrimination.   The record demonstrates that Canasa did not follow Abercrombie's interviewing protocols.  Canasa unlawfully considered Ms. Banafa's hijab in refusing to hire her.

She asked questions that were not only violative of the protocols, but also deemed "illegal" by Abercrombie.  (Thanasombat Decl. Exh. 5 [Riley Dep. 109:16-112:21]; Exh. 16 [Canasa ex. 4]; Exh. 4 [Yoakum Dep. 283:12-285:8].)  Canasa did not hire Ms. Banafa because she was "not abercrombie look."  She scribbled out annotations next to this incriminating phrase.  A jury could easily infer that she scribbled out a reference to Ms. Banafa's hijab.  A jury could conclude that, based on the totality of circumstances including the questions about religion and hijab, Canasa dismissed Ms. Banafa because of her hijab.[9]

In addition, Canasa deviated from the interview guide and rated Ms. Banafa on her appearance. She testified that "not abercrombie look" referred to the fact that Ms. Banafa was not "enthusiastic" or "confident". (Thanasombat Decl. Exh. 8 [Canasa Dep. 87:18-25]).  Corporate HR officials, Deon Riley and Amy Yoakum, interpreted this notation to be an impermissible reference to Ms. Banafa's appearance.  (Thanasombat Decl. Exh. 5 [Riley Dep. 119:11-120:16]; Exh. 4 [Yoakum Dep. 282:18-283:5].)  If these two Abercrombie insiders understood the notation to refer to Ms. Banafa's appearance, surely a jury could come to the same conclusion.  Nevertheless, it is not for the court, but a jury, to determine what Canasa meant. "The 'task of disambiguating ambiguous utterances is for trial, not for summary judgment.'" *Huff v. UARCO Inc.,* 122 F.3d 374, 384 (7th Cir.1997) (quoting *Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir.1990)).

### C. The EEOC Can Establish a *Prima Facie* Case that Defendant Failed

---

[9] When not concerned that the truth could indict her, Canasa acknowledged that the notation "neat Abercrombie style" referred to a PTI applicant's grooming.  It is only here, under the lens of unlawful discrimination, that she claims, unconvincingly, that "not abercrombie look" referred to Ms. Banafa's demeanor.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 182:12-25; 183:18-184:3]; Exh. 33 [Canasa ex. 16 (AF_001224)].)

**to Provide Ms. Banafa with a Reasonable Accommodation**

Title VII requires an employer, once on notice, to reasonably accommodate an employee whose sincerely held religious belief, practice, or observance conflicts with a work requirement, unless providing the accommodation would create an undue hardship [10]. 42 U.S.C. §2000e(j).  In the Ninth Circuit, the EEOC can establish a *prima facie* case by proving that Ms. Banafa had a sincerely held religious belief that conflicted with Defendant's work requirements, that she informed Defendant of the belief and conflict, and that Defendant failed to provide a religious accommodation.  *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993).  Once a *prima facie* case is established, Defendant has the burden to prove that the accommodation would create an undue hardship. [11]  42 U.S.C. § 2000e(j); EEOC Guidelines, 29 C.F.R. § 1605.2(b).  The EEOC has shown in its Motion for Partial Summary Judgment that Defendant cannot prove its affirmative defense.

Defendant argues that dismissal is warratnted based  on just one aspect of the *prima facie* case—that Ms. Banafa would not be able show a nexus between her hijab and Defendant's refusal to hire her.  A *prima facie* case can be established handily by inferences drawn in favor of the EEOC. Ms. Banafa needed to wear a hijab while working for Defendant.  During her interview, and in response to Canasa's probing, Ms. Banafa informed Canasa that she could not remove her hijab at work due to her religion, thus putting Defendant on notice of her need for a religious accommodation. "While the law does not require that a potential employer divine the existence of a conflict or discern whether an accommodation is desired, there is no magic incantation required to put an employer on notice either. It would be contrary to the purpose of the statute to permit a potential employer to close his eyes to that which is obvious in favor of a rule requiring particular verbiage to trigger constitutional protection. Indeed, we know of no such an "abracadabra" rule." *E.E.O.C. v. White Lodging Services Corp*. 2010 WL 1416676, *6. (W.D. Ky. 2010)

---

[10]  An accommodation causes an "undue hardship" when it results in more than a de minimis cost to the employer. *TWA v. Hardison*, 432 U.S. 63, 84 (1977).  However, "any proffered hardship, however, must be actual; '[a]n employer cannot rely merely on speculation.'" *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1490-92 (10th Cir. 1989).  "A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships." *Id.* at 1492 (citations omitted).

1    Defendant's Look Policy prohibits employees from wearing caps or other headwear, a Look

2    Policy prohibition that was emphasized to  Canasa before she interviewed Ms. Banafa.  A reasonable

3    fact-finder could infer from the evidence that Canasa questioned whether Ms. Banafa needed to wear

4    the hijab because she understood that it was an impediment to Ms. Banafa's candidacy.  A jury could

5    conclude that Canasa clearly focused on Ms. Banafa's hijab as evidenced by Canasa's annotation

6    that Ms. Banafa was "not abercrombie look."  Thus, drawing inferences in the light most favorable

7    to the EEOC, a fact-finder not only could easily find, but is likely to find, that Canasa rejected Ms.

8    Banafa because she would not allow Ms. Banafa to wear a hijab at work.  *Id.* (finding material

9    factual dispute as to whether interviewer refused to consider Muslim women for employment

10   because of their hijabs).

11    While claiming to cast evidence in the light most favorable to the EEOC, Defendant

12   completely ignores the most critical facts:  Canasa undeniably wrote "not abercrombie look" in Ms.

13   Banafa's Interview Guide, and she scribbled out a statement that suspiciously looks like "head gear"

14   on the Interview Guide.  Although Canasa now claims that she did not take the hijab into

15   consideration, she is simply not credible.  Credibility is a question for a jury.

Deleted: ¶

**V.     INJUNCTIVE RELIEF**

Title VII grants a court authority to "enjoin [an employer] from engaging in [an] unlawful employment practice, and order such . . . equitable relief as the court deems appropriate." 42 U.S.C. Section 2000e-5(g)(1).  Victims of employment discrimination are generally entitled to an injunction against future discrimination unless the employer proves it is unlikely to repeat the practice.  *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987). ). This is a "heavy burden." *U.S. v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953).

The purpose of injunctive relief is to deter future unlawful discrimination.  *Id.* at 1543.  This is a "heavy burden." *U.S. v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953).  In seeking injunctive relief, the "EEOC promotes *public* policy and seeks to vindicate rights belonging to the United States as sovereign." *EEOC v. Occidental Life Ins. Co.*, 535 F.2d 533, 537 (9th Cir.1976).) (emphasis added).

To avoid the imposition of injunctive relief an employer must prove that "'there is no reasonable expectation that the wrong will be repeated,'" and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Cnty. of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979).  Only if both conditions are met will an action be considered moot. *Id*  There is a material factual dispute as to whether Defendant can satisfy this burden.

A jury's finding that Defendant engaged in intentional discrimination warranting punitive damages would be an implicit finding that Defendant's training on both the interview protocol and religious accommodation were deficient.  Indeed there is evidence in the record that Adam Chapa and Kuulei Otis could not recall receiving any training on religious discrimination or religious accommodation.  They both worked for Abercrombie as managers for three years, and Otis was promoted to a position where she supervised as many as 350 employees.  (Thanasombat Decl. Exh. 2 [Chapa Dep. 9:18-24]; Exh.6 [Otis Dep. 19:23-25, 48:24-51:1, 120:6-22, 152:9-153:1].)  . Their inability to recall EEO training, coupled with Canasa's clear violation of the standards Abercrombie professes to hold, casts doubt on the extent to which the training is actually occurring.  A poorly trained workforce is likely to repeat unlawful behavior.

Sufficient evidence exists of a plausible chance of recurrence because Canasa continues to work for Abercrombie. Injunctions are particularly appropriate where the individuals who engaged

1  in discrimination remain the defendant's primary decision-makers.  *EEOC v. Ilona of Hungary*, 108

2  F.3d 1569, 1579 (7th Cir. 1997); *EEOC v. Accurate Mechanical Contractors, Inc.*, 863 F.Supp. 828,

3  838 (E.D. Wis. 1994).  Janet Canasa remains gainfully employed as a Store Manager.  She not only

4  has hiring authority, but as a Store Manager, she supervises subordinates who are charged with

5  interviewing and hiring.  (Thanasombat Decl. Exh. 8 [Canasa Dep. 138:7-14].)  Moreover, a jury's

6  rejection of her testimony would constitute evidence of her willingness to lie about discriminatory

7  behavior and her unreliability as a supervisor.

8         **A.**    **There is a Material Factual Dispute as to Whether**

9                 **Defendant Has Truly Reformed**

10       An employer's voluntary cessation of a discriminatory policy does not deprive the court of

11  authority to grant injunctive relief.  "An employer that takes curative actions only after it has been

12  sued fails to provide sufficient assurances that it will not repeat the violation to justify denying an

13  injunction."  *Goodyear*, at 1544; *see also Rowe v. General Motors Corp.*, 457 F.2d 348, 359 (5th Cir.

14  1972) ("[P]rotestations or repentance and reform timed to anticipate or blunt the force of a lawsuit

15  offer insufficient assurance that the practices sought to be enjoined will not be repeated.")(citations

16  omitted); *EEOC v. Premier Operator Services*, 75 F.Supp.2d 550, 563 (N.D. Tex.1999)(refusing to

17  grant summary judgment on injunctive relief although Defendant had voluntarily discontinued the

18  "English Only" policy at issue).

19       Abercrombie revised its Look Policy only because of lawsuits filed by the EEOC.

20  (Thanasombat Decl. Exh. 33 [Riley-Tulsa Dep. 101:20-102:16].)  Abercrombie is entrenched in its

21  position that it is not legally required to allow its associates to wear hijabs and that it has done

22  nothing wrong.  *See* Docket #75 [MSJ at p.23].  Indeed Abercrombie appealed an order finding that

23  it lacked evidence to prove that allowing employees to wear hijabs would cause undue hardship.

24  (Thanasombat Decl. Exh. 29 [*Elauf* Notice of Appeal].)  It is plausible that Abercrombie will

25  reinstate its past practices once it is no longer under the scrutiny of pending litigation.  *See U.S. v.*

26  *City & County of San Francisco*, 656 F. Supp. 276, 286-88 (N.D. Cal. 1987) (fact that defendant

27  tenaciously defended the challenged practice shows need for injunctive relief even where defendant

28  voluntarily abandoned its practice).

PLAINTIFF EEOC'S OPPOSITION TO
DEFENDANT'S MOTION FOR                    20
SUMMARY JUDGMENT

**B.** **The EEOC's Claim for Injunctive Relief Is Not Overbroad**

By its very terms, the EEOC's claim for injunctive relief extends beyond an order requiring Abercrombie to follow the law.  The EEOC asks the court to exercise its power to fashion relief which could include the adoption of policies *or* practices *or* programs which "eradicate the effects of its past and present unlawful employment practices."   The Supreme Court has recognized that district courts should "be alert to adjust their remedies" in order to "'secure complete justice.'" *Abermarle Paper Co. v. Moody,* 422 U.S. 405, 418 (1975)( "the district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.").  The Ninth Circuit has rejected arguments that injunctive relief is "superfluous," explaining that "an injunction would (1) instruct [the employer] that it must comply with federal law [and] (2) subject it to the contempt power of federal courts if it commits future violations. . ." *Goodyear*, 813 F.2d at 1544. Furthermore, injunctive relief does not hinge on evidence of a pattern of discrimination.  "[I]njunctive relief is appropriate even where the Commission has produced no evidence of discrimination going beyond the particular claimant's case." *Ilona of Hungary*, 108 F.3d at 1578; *Bruso v. United Airlines*, 239 F.3d 848, 864 (7th Cir. 2001) (no pattern or practice required); *EEOC v. Harris Chernin, Inc.*, 10 F.3d 1286, 1292 (7th Cir. 1993) (reinstating EEOC's claims for injunctive relief to protect "older employees generally").

Defendant highlights several cases where the EEOC's request for injunctive relief has been denied.  These cases are not useful since the court must evaluate the circumstances of each case in deciding whether to award injunctive relief.  The EEOC has successfully obtained injunctive relief after proving intentional employment discrimination in several other cases. *See, e.g  EEOC v.Service Temps*, 2011 WL 5108733- (N.D. Tex.. 2010); *EEOC v. Target*, 98 FEP Cases 1356 (7th Cir. 2006); *EEOC v. Wal-Mart Stores, Inc.*, 11 F.Supp.2d 1313, 1331 (D.N.M. 1998), *aff'd*  202 F.3d 281 (10th Cir. 1999)

Finally, the decision on injunctive relief in *EEOC v. Abercrombie & Fitch Stores, Inc. d/b/a abercrombie Kids*, 09-cv-602-GKF-FHM (N.D. Okla.), has no bearing here.  Although both cases involve Abercrombie's refusal to hire a woman wearing a hijab, this case also involves a disparate

1  treatment claim. Canasa's probing about Ms. Banafa's religion provides this court with a different

2  perspective on Defendant's workforce. Moreover, that decision preceded Abercrombie's notice of

3  appeal and ongoing refrain that it has done nothing wrong.

4  **VI.    JURY COULD EASILY AWARD PUNITIVE DAMAGES**

5          There is sufficient evidence for a jury to award punitive damages. To recover punitive

6  damages**,** a plaintiff must demonstrate that the employer acted with malice or reckless disregard to

7  the plaintiff's federally protected rights. *Kolstad v. Am. Dental Assoc.,* 527 U.S. 526, 534 n27

8  (1999). "Malice" or "reckless disregard" are defined as the "employer's knowledge that it may be

9  acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* 535.

10  Moreover, an employer acts with "reckless disregard" where the plaintiff demonstrates that the

11  employer violated the law notwithstanding its awareness of anti-discrimination principles.

12  *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1198 (9th Cir. 2002). An employer may escape

13  liability for punitive damages only if has undertaken sufficient "good faith efforts at Title VII

14  compliance." *Kolstad,* 527 U.S. at 2129, n10.

15          Punitive damages may be imputed to an employer where: (1) the employer authorized the act

16  and the manner of the act; (2) the employer acted recklessly in employing the agent; (3) the

17  misconduct was committed by a "managerial employee" acting within the "scope of employment";

18  or (4) the employer or a managerial agent ratified or approved the act. *Kolstad,* 527 U.S. at 542-543.

19  There is significant evidence that Canasa served in a managerial capacity and was acting within the

20  scope of her employment. *Kolstad,* 527 U.S. at 543 (the agent "need not be the employer's 'top

21  management, officers, or directors'") An employee with authority to "hire, fire, discipline or

22  promote, or at least to participate in or recommend such actions" can subject an employer to punitive

23  damages. *Miller v. Bank of Am.,* 600 F.2d 211, 213 (9th Cir. 2000). Canasa had full authority to

24  hire. (Thanasombat Decl. Exh. 5 [Riley Dep. 104:24-105:6].) Moreover, Abercrombie left her alone

25  to manage the kids store.

26          A jury could conclude that it was reckless for Abercrombie to empower Canasa to interview

27  and hire independently. Due to an apparent staffing shortage, Defendant abandoned its 90-day MIT

28  program and transferred Canasa to work alone as an Assistant Manager after a two-week self-study

1   training.  Canasa had not completed PSP or diversity training before she interviewed Ms. Banafa.

2   Her training log reflects that she did not complete either training until April 2008, a month after she

3   rejected Halla Banafa.  And the only managers available to train her while she worked as an MIT in

4   the adult store deny providing  any on-the-job training.  Indeed, Adam Chapa said he would not have

5   assigned an MIT to interview on his or her own because they didn't have the necessary experience.

6          Alternatively, there is substantial evidence that Canasa acted with reckless disregard of Title

7   VII, if not malice.  A jury could find that she received both diversity and PSP training, understood

8   that Title VII prohibited religious discrimination, yet rejected Ms. Banafa because she is Muslim.

9   Thus, a trier of fact could conclude that she acted in the "face of a perceived risk". *Kolstad* 527 U.S.

10  at 536.

11         Defendant contends that it acted in good faith because it has EEO polices and a structured

12  interview system.  However, an employer's good faith efforts to comply with the anti-discrimination

13  policies are insufficient if the policies are not enforced or are ineffective.  *Bains LLC v. Arco*

14  *Products,* 405 F.3d 764, 774 (9th Cir. 2005).  There is sufficient evidence for a jury to conclude that

15  Abercrombie's  programs are not effective. Despite three years of employment with Abercrombie,

16  General Manager, Adam Chapa was unfamiliar with concepts of religious discrimination and never

17  received instruction as to whether it was permissible for interviewers to ask applicants about their

18  religion during an interview.  He had a "personal understanding" that such questions are

19  unacceptable.  (Thanasombat Decl. Exh. 2 [Chapa Dep. 87:11-23 67:12-15; 68:10-16].)  Kuulei Otis

20  had the same personal belief, but did not know whether the belief was shared within the "entire

21  Abercrombie Family."  (Thanasombat Decl. Exh. 6 [Otis Dep. 120:5-22].)   Otis was responsible for

22  supervising and training hundreds of employees.  From this evidence a jury could conclude that the

23  lack of training was shared by other managers.

24

25

26

27

28

1

2 **VII.    CONCLUSION**

3       For the foregoing reasons, the EEOC respectfully requests that this Court deny

4 Abercrombie's motion for summary judgment.

5

6 Dated:  August 27, 2012            _____*//s//Sirithon Thanasombat*_____

                                  SITITHON THANASOMBAT

7                                   Attorney for Plaintiff EEOC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28