1   Douglas E. Dexter, SBN 115868
    FARELLA BRAUN + MARTEL LLP
2   235 Montgomery Street, 17th Floor
    San Francisco, CA 94104
3   Telephone: (415) 954-4400
    Facsimile: (415) 954-4480
4   E-mail: ddexter@fbm.com

5   Mark A. Knueve (OB No. 0067074) Admitted Pro Hac Vice
    Daniel J. Clark (OB No. 0075125) Admitted Pro Hac Vice
6   Samantha A. Stilp (OB No. 0086907) Admitted Pro Hac Vice
    VORYS, SATER, SEYMOUR AND PEASE LLP
7   52 East Gay Street
    P.O. Box 1008
8   Columbus, Ohio 43216-1008
    Telephone: (614) 464-6387
9   Facsimile: (614) 719-4808
    E-mail: maknueve@vorys.com
10  E-mail: djclark@vorys.com
    E-mail: sastilp@vorys.com
11  Attorneys for Defendant
    ABERCROMBIE & FITCH STORES, INC.
12  dba ABERCROMBIE KIDS

13

14                  UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                         SAN JOSE DIVISION

17  U.S. EQUAL EMPLOYMENT              Case No. 5:10-cv-03911-EJD
    OPPORTUNITY COMMISSION

18          Plaintiff,

19          vs.                        **DEFENDANT'S OPPOSITION TO
                                       PLAINTIFF'S MOTION FOR
20  ABERCROMBIE & FITCH STORES, INC.   PARTIAL SUMMARY JUDGMENT**
    dba ABERCROMBIE KIDS,

21                                     Date: September 28, 2012
            Defendant.                 Time: 9:00 a.m.
22                                     District Judge Edward J. Davila
                                       Courtroom: 4
23

24

25

26

27

28

1

**TABLE OF CONTENTS**

Page

I.   STATEMENT OF FACTS ................................................................................. 1

    A.   Introduction ............................................................................................ 1

    B.   Abercrombie promotes its products through the in-store experience,
        including the clothing worn by employees who work on the sales floor ................ 1

    C.   Halla Banafa failed to mitigate her damages ........................................ 6

II.  STANDARD OF REVIEW ............................................................................. 6

III. ARGUMENT ................................................................................................. 7

    A.   The Court should deny the EEOC's Motion for Summary Judgment On
        Abercrombie's Fourth Affirmative Defense, Failure To Mitigate Damages .......... 7

    B.   The Court should deny the EEOC's Motion for Summary Judgment on
        Abercrombie's Eighth Affirmative Defense, Undue Hardship ............................... 9

        1.   The EEOC's Motion should be denied because the EEOC has not,
            and cannot, establish a prima facie case, and thus the burden has not
            shifted to Abercrombie to prove undue burden ............................................ 9

        2.   Even if the EEOC's Motion were not procedurally improper, it
            would still fail because there is at least a genuine issue of fact as to
            whether the accommodation the EEOC seeks for Banafa would
            have caused an undue hardship on Abercrombie's business .................. 10

        3.   Accommodations made by Abercrombie relating to the Look Policy
            do not foreclose Abercrombie from proving undue hardship .................. 15

        4.   The EEOC's other arguments lack merit ................................................. 17

        5.   The Oklahoma Decision has been appealed ............................................. 18

    C.   The Court should deny the EEOC's Motion for Summary Judgment on
        Abercrombie's Tenth Affirmative Defense, Infringement of Commercial
        Free Speech ......................................................................................................... 18

        1.   Abercrombie Engages in Protected Speech to Advertise Its Brand .......... 18

        2.   Compelling Abercrombie to Advertise a Style or Fashion Which Is
            Inconsistent With Its Brand Violates the First Amendment ...................... 19

    D.   Abercrombie agrees to withdraw its Fifth and Sixth Affirmative Defenses ......... 23

VIII. CONCLUSION .............................................................................................. 23

CERTIFICATE OF SERVICE ............................................................................... 24

# TABLE OF AUTHORITIES

**Page**

## CASES

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)......................................................................7

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ............................................................6, 7

Beadle v. City of Tampa, 42 F.3d 633 (11th Cir. 1995) .........................................................11, 17

Booker v. Taylor Milk Co., 64 F.3d 860 (3d Cir. 1995)..............................................................7

Bryant v. Better Business Bureau of Greater Maryland, 923 F. Supp. 720 (D. Md. 1996) ..............................................................................................................................5

Caudle v. Bristow Optical Co., 224 F.3d 1014 (9th Cir. 2000) ....................................................7

Cent. Hudson Gas & Elecl. Corp. v. Public Serv. Comm'n, 447 U.S. 557 (1980)....................22

Cloutier v. Costco Wholesale Corp., 390 F.3d 126 (1st Cir. 2004)......................................13, 14

Cook v. Chrysler, 981 F.2d 336 (8th Cir. 1992) ...................................................................10, 17

Cross v. Bailer, 477 F. Supp. 748 (D. Or. 1979)........................................................................11

Daniels v. City of Arlington, 246 F.3d 500 (5th Cir. 2001)........................................................14

Drazewski v. Waukegan Dev. Center, 651 F. Supp. 754 (N.D. Ill. 1986)................................11

EEOC v. Abercrombie & Fitch Stores, Inc., 798 F. Supp.2d 1272 (N.D. Okla. 2011) ..............................................................................................................................18

EEOC v. Aldi, Inc., No. 06-01210, 2009 U.S. Dist. LEXIS 91554, (W.D. Pa. Sep. 30, 2009) ......................................................................................................................11, 12

EEOC v. Kelly Services, Inc., 598 F.3d 1022 (8th Cir. 2010)....................................................13

EEOC v. Pape Lift, Inc., 115 F.3d 676 (9th Cir. 1997) ................................................................8

EEOC v. Service News Co., 898 F.2d 9583 (4th Cir. 1990) .........................................................8

EEOC v. The GEO Group, Inc., 616 F.3d 265 (3d Cir. 2010) ...................................................10

Harrell v. Donahue, 638 F.3d 975 (8th Cir. 2011)......................................................................11

Heller v. EBB Auto. Co., 8 F.3d 1433 (9th Cir. 1993) .................................................................9

Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp. Of Boston, 515 U.S. 557 (1995)........................................................................................................................19, 20, 21, 22

Hussein v. The Waldorf-Astoria, 134 F. Supp.2d 591 (S.D.N.Y. 2001) ...................................14

Li v. Sheltzer, 2008 U.S. Dist. LEXIS 103352 (E.D. Ca. 2008)...................................................7

Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241 ......................................................................20

Myers v. Hose, 50 F.3d 278 (4th Cir. 1995) ................................................................................15

Oden v. Southern Railroad Co., 1984 U.S. Dist. LEXIS 15358 (N.D. Ga. June 29, 1984) ................................................................................................................................8

Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal., 475 U.S. 1 (1986)............................20, 22

Peterson v. Hewlett-Packard Co., 358 F.3d 599 (9th Cir. 2004) ..................................................9

Prach v. Hollywood Supermarket, Inc., No. 09-13756, 2010 U.S. Dist. LEXIS 88738 (E.D. Mich. Aug. 27, 2010) ..............................................................................12, 16

R.J. Reynolds Tobacco Co. v. United States FDA, 823 F. Supp.2d 36 (D.D.C. 2011) .................................................................................................................... 20

Riley v. Nat'l. Fed'n of the Blind of N.C., Inc., 487 U.S. 781 (1988) ...................... 20

Sanchez-Rodriguez v. AT&T Wireless, 728 F. Supp.2d 31 (D.P.R. 2010) ..................... 11, 14

Sanders v. Southwestern Bell Tel., L.P., 544 F.3d 1101 (10th Cir. 2008) .................... 7

Sellers v. Delgardo College, 902 F.2d 1189 (5th Cir. 1990) ............................... 7, 8

Smith v. Ameritech, 129 F.3d 857 (6th Cir. 1997) ........................................ 15

Tiano v. Dillard Dep't Stores, Inc., 139 F.3d 679 (9th Cir. 1998) ........................... 9

Toledo v. Nobel-Sysco, Inc., 892 F.2d 1481 (10th Cir. 1989) ............................... 15

Tooley v. Martin-Marietta Corp., 648 F.2d 1239 (9th Cir. 1981) ....................... 15, 21

Trans World Airlines, Inc. v. Hardison, 432 U.S. 63 (1977) .............................. 10

Tubari Ltd., Inc. v. NLRB, 959 F.2d 451 ................................................... 7

U.S. v. City of Albuquerque, 545 F.2d 110 (10th Cir. 1976) ............................... 11

Vande Zande v. Wisconsin Dep't. of Admin., 44 F.3d 538 (7th Cir. 1995) .................. 15

Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748 (1972) ............................................................................. 19

Walker v. Alcoa, Inc., No. 4:06-CV-120-JVB, 2008 U.S. Dist. LEXIS 45684 (N.D. Ind. Jun. 9, 2008) ....................................................................... 16

Webb v. City of Philadelphia, 562 F.3d 256 (3d Cir. 2009) ..................... 10, 11, 13, 17

Wooley v. Maynard, 430 U.S. 705 (1976) ............................................... 20, 22

Yott v. North American Rockwell Corp., 602 F.2d 904 (9th Cir. 1979) ....................... 11

Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626 (1985) .................................................................................. 20

**RULES**

Fed. R. Civ. P. 56(C) ....................................................................... 6

## I.    STATEMENT OF FACTS

### A. **Introduction.**

A full statement of the facts of this case was set forth in Defendant's Motion for Summary Judgment Or, In The Alternative, Summary Adjudication [Docket # 75] (hereinafter "Defendants' Motion") at pages 8-14, which is hereby specifically incorporated herein by reference.  This brief will only set forth those facts relevant to the EEOC's Motion for Partial Summary Judgment [Docket # 80] (hereinafter, the "EEOC's Motion").

### B. **Abercrombie promotes its products through the in-store experience, including the clothing worn by employees who work on the sales floor.**

Abercrombie & Fitch Stores, Inc. is a clothing retailer that operates stores under a variety of brand names, including abercrombie, which sells casual apparel targeted to boys and girls ages 7 to 14.[1]  (Canasa Dep. 211-12).[2]  Abercrombie has created a brand identity to draw abercrombie's target customers to abercrombie stores and to abercrombie's merchandise.  (Riley-

---

[1]  For ease of reference "Abercrombie" will be used hereinafter to denote both defendant Abercrombie & Fitch Stores, Inc. and the abercrombie brand.

[2] Cited pages of Janet Canasa's deposition are attached as Exhibit A to the Declaration of Samantha Stilp in Support of Defendant's Opposition to Plaintiff's  Motion for Partial Summary Judgment ("Stilp Decl.")  and are referred to herein as "Canasa Dep. ___."  Cited pages of Halla Banafa's deposition are attached as Exhibit B to Stilp Decl. and are referred to herein as "Banafa Dep. ___."  Cited pages of Deon Riley's deposition dated March 17, 2011 are attached as Exhibit C to Stilp Decl. and are referred to herein as "Riley-Tulsa Dep. __."  Cited pages of Deon Riley's deposition dated March 14, 2012 are attached as Exhibit D to Stilp Decl. and are referred to herein as "Riley Dep. __."  Cited pages of Chad Moorefield's deposition taken in the Tulsa Litigation are attached as Exhibit E to Stilp Decl. and are referred to herein as "Moorefield-Tulsa Dep. __."  Cited pages of Adil Muschelewicz's deposition are attached as Exhibit F to Stilp Decl. and are referred to herein as "Muschelewicz Dep. __."  Cited pages of Ahmed Banafa's deposition are attached as Exhibit G to Stilp Decl. and are referred to herein as "Ahmed Banafa Dep. __."  Cited pages of Dr. Kathleen Moore's deposition are attached as Exhibit H to Stilp Decl. and are referred to herein as "Moore Dep. __."  Cited pages of Jessica Passalacqua's deposition are attached as Exhibit I to Stilp Decl. and are referred to herein as "Passalacqua-St. Louis Dep. __." Cited pages of Adam Chapa's deposition are attached as Exhibit J to Stilp Decl. and are referred to herein as "Chapa Dep. __."  Cited pages of Adam Chmielewski's deposition are attached as Exhibit K to Stilp Decl. and are referred to herein as "Chmielewski Dep. __."  Janet Canasa's declaration is attached as Exhibit L to Stilp Decl. and referred to herein as "Canasa Decl. __."

Tulsa Dep. 78).  The abercrombie brand exemplifies a classic East Coast collegiate style of clothing that has been described as "casual" and "preppy."  (Moorefield-Tulsa Dep. 94-95, 155).  At the time relevant to this litigation, abercrombie sold form-fitting and body conscious clothing, including jeans, t-shirts, and tank tops.  (Banafa Dep. 86).

Abercrombie is unique among retailers in that it does virtually no advertising through television, print, or radio.  (Canasa Decl. ¶ 5; Moorefield-Tulsa Dep. 138). Rather, Abercrombie promotes its products through its in-store experience.  (Canasa Decl. ¶ 5).  Abercrombie makes great efforts to ensure that all of the "senses" in the store – the sight, sound, scent, "taste," "touch," and "energy" – reflect Abercrombie's vision of the brand.  (Riley-Tulsa Dep. 130; Moorefield-Tulsa Dep. 48-49; Passalacqua-St. Louis Dep. 40-41).  Abercrombie also makes great efforts to avoid things in stores which are inconsistent with its vision of the brand.  (Riley-Tulsa Dep. 130).  Abercrombie's goal is that its target customers will have an in-store experience which perfectly matches Abercrombie's vision of its brand, and thus be inspired to adopt the Abercrombie style of dress and purchase Abercrombie clothing.  (Riley-Tulsa Dep. 31; Moorefield-Tulsa Dep. 198; Passalacqua-St. Louis Dep. 45-46 ("it's a core belief of our company that our customers are brand savvy, and they will . . . see an employee and know whether the merchandise is on brand or not, and we depend on that employee to be a model to hopefully inspire that customer to purchase our merchandise." ))  Through these efforts regarding the in-store experience, Abercrombie obtains a competitive advantage over retailers that rely on more traditional means of advertisement.  (Riley-Tulsa Dep. 130, 132).

Abercrombie's in-store employees play a critical role in the in-store experience.  (Riley-Tulsa Dep. 19). Employees who work on the sales floor are titled "Models" and are expected to wear clothing in the Abercrombie style and thus "model" the Abercrombie style for customers.  (Riley-Tulsa Dep. 29-30, 72; Moorefield-Tulsa Dep. 100, 138, 217).  Employees who work in

both the stock room and on the sales floor are titled "Impact" or "PTI" employees and are also required to wear the Abercrombie style, although their primary function is not to model the Abercrombie style.  (Riley-Tulsa Dep. 161; Moorefield-Tulsa Dep. 34, 52).

To ensure a consistent in-store experience, Abercrombie enforces a dress and grooming policy known as the Look Policy.  (Canasa Dep. 124; Canasa Dep. Exh. 11).  Under the Look Policy, associates must wear clothing that is similar to the Abercrombie style, and not wear clothing that is inconsistent with the Abercrombie style.  (Canasa Dep. 46-47).  The Look Policy prohibits piercings, fingernail paint, and heavy makeup.  (Canasa Dep. 46-47).  The Look Policy also prohibits all caps and headwear because headwear distracts from the Abercrombie style.  (Moorefield-Tulsa Dep. 156-157).  One of Abercrombie's guiding principles is:  if it is the "first thing" that a customer might notice, and it is not the Abercrombie style, it is not consistent with the Look Policy.  (Riley-Tulsa Dep. 98-101).

Applicants for employment are informed of the Look Policy during the interview process.  (Riley-Tulsa Dep. 63-64; Chmielewski Dep. 87).  New associates sign an acknowledgement of the Look Policy when they are hired, and the Look Policy also appears in the Abercrombie employee handbook.  (Chmielewski Dep. 87; Moorefield – Tulsa Dep. 152).  Abercrombie carefully monitors compliance with the Look Policy through a variety of means, including store audits, Secret Shopper reports, and training.  (Chmielewski Dep. 87-88; Moorefield – Tulsa Dep. 180-181, 183-185, 199-202).  Abercrombie strictly enforces the Look Policy and Models who are not in compliance with the Look Policy are sent home.  (Chapa Dep. 45; Chmielewski Dep. 71-72).

Compliance with the Look Policy is a key to Abercrombie's success. (Riley-Tulsa Dep. 31-32).  An employee on the sales floor who violates the Look Policy by wearing clothing that is not consistent with the Abercrombie style inaccurately represents the brand, causes customer

confusion, and ultimately damages the brand. (Riley-Tulsa Dep. 130 ("the company's built on our brand . . . exceptions will take away from who we are as a brand"); Moorefield-Tulsa Dep. 218 ("I have seen stores or managers that do a poor job of enforcing our Look Policy and have seen low sales scores because of it"); Passalacqua-St. Louis Dep. 19, 38, 42-43 ("they were not adhering to the Look Policy, and that's an indicator of a major problem within the Store Experience section, and that's really the section we depend upon for our business and driving our brand") (the teen population is "fickle and they know their brands and look for their brands as a way of purchase") (exceptions to the Look Policy are "brand damaging on many levels") (Look Policy exemption in one store could affect Abercrombie's control over brand because "if someone were to have a bad experience or a poor brand experience in one of our stores, they would carry that through the other brands and through others malls that we have stores in"); Chmielewski Dep. 42, 60-62, 72, 82-83, 200 (discussing harms of deviations from Look Policy, including brand confusion and negative effect on sales) ("locations that were rehabbed were not performing well, and the Look Policy was an issue in that performance") (deviations from Look Policy "would have an impact upon our business. . . Our in-store experience is our advertising. Our in-store associates represent the brand.  If they are not doing that, customers don't have a clear picture of what our brand is.  Sales would suffer, people would be confused about the brand and certainly our sales would be hurt by that.") (noncompliance with the Look Policy results in customer "becom[ing] confused . . . they may leave the store with the wrong impression of our brand, model that outside of the store" ultimately resulting in "our brand being damaged.").

Abercrombie has offered accommodations relating to the Look Policy over the years. Decisions to accommodate are made on a case by case basis after examining all of the circumstances attendant to the request, including the position of the associate making the request, the size of the store, the accommodation requested, and other factors.  (Riley Dep. 47, 115, 148,

161, 186, 196-197, 232).   Although the EEOC's Motion trumpets that Abercrombie has made "at least 70 exceptions to the Look Policy since 2006," <u>see</u> EEOC's Motion at 7, that number is placed into perspective by the EEOC's prior statement that in 2008 (one year), Abercrombie employed between 200,000 and 250,000 part-time employees. <u>Id.</u> at 2.  Moreover, the EEOC fails to point out that the vast majority of accommodations made by Abercrombie were for accessories that were not noticeable, and thus were not distracting from the Abercrombie style. For example, Abercrombie granted religious accommodations for nose piercings, provided that the piercing was covered or the stud was replaced by a clear spacer; small necklaces, where the necklace was not noticeable; and facial hair, if it was kept closely groomed.  (Riley-Tulsa Dep. 153-154; 162-163, 172-173). [3]

The EEOC's Motion also notes that prior to Banafa's application, Abercrombie allowed some employees to wear head coverings as an accommodations.  <u>See</u> EEOC's Motion at 7. Those decisions, however, were based on facts and circumstances that existed with respect to each request for accommodation, all of which were separate and distinct from Banafa's situation. <u>See</u> <u>e.g.</u> Exh. 12 to EEOC's Motion (granting temporary <u>medical</u> accommodation for current employee on medication which periodically resulted in patchy hair loss); Exh. 13 to EEOC's Motion (granting accommodation for PTI to wear headscarf where work was limited to stockroom, and employee would not work on sales floor).

The EEOC's Motion finally notes that Abercrombie has made more religious accommodations for headscarves since 2010.  <u>See</u> EEOC's Motion at 8.  Two years after Banafa applied for employment with Abercrombie, Abercrombie made the business decision to allow

---

[3]  Abercrombie also granted medical accommodations for employees with medical conditions. (Riley-Tulsa Dep. 238).  Obviously, requests for medical accommodations are judged under the ADA and thus have a different (and more stringent for the employer) legal standard.  <u>See</u> <u>Bryant v. Better Business Bureau of Greater Maryland</u>, 923 F. Supp. 720, 740 (D. Md. 1996) (employer faces "substantially more difficulty" to satisfy undue hardship under ADA than Title VII).

more accommodations despite the fact that doing so creates an undue hardship to its business in order to avoid threatened continued and repeated litigation by the EEOC and the Council on American Islamic Relations. (Riley-Tulsa Dep. 102).

### C.   Halla Banafa failed to mitigate her damages.

Halla Banafa applied for employment with Abercrombie on March 8, 2008.  (Banafa Dep. 103). Prior to applying for work with Abercrombie, Banafa had never held a job in her life. (Banafa Dep. 64.  In fact, she had only had two job interviews prior to interviewing with Abercrombie – one at Starbucks and the other at FedEx.  (Banafa Dep. 73).  She was not offered a job after any of the three interviews. (Banafa Dep. 74-75).

After her interview with Abercrombie, Banafa completely discontinued her job search for approximately five months.  (Banafa Dep. 171).  At the time, she was living at home and studying psychology at Mission College. (Banafa Dep. 23).  Banafa admitted at her deposition that she made no further effort to find a job until she got married and moved to South Carolina in July 2008.  (Banafa Dep. 171).

After moving to South Carolina, Banafa applied for work at Olive Garden and was offered a job, which she still held as of her deposition in this case.  (Banafa Dep. 41, 66).  Banafa completely stopped wearing a head scarf upon moving to South Carolina.  (Banafa Dep. 51).

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(C).  Material facts are facts that may affect the outcome of the litigation under applicable substantive law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could find in favor of the nonmoving party.  See id.

The party moving for summary judgment bears the burden of establishing the lack of a

genuine issue of material fact.  See <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).  At

the summary judgment stage, "[t]he evidence of the nonmovant is to be believed, and all

justifiable inferences are to be drawn in his favor."  <u>Anderson</u>, 477 U.S. at 255.  "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge" on summary judgment.  <u>Id.</u>; <u>Sanders v.</u>

<u>Southwestern Bell Tel., L.P.</u>, 544 F.3d 1101, 1105-06 (10th Cir. 2008) ("it is not our province at

the summary judgment stage to weigh the evidence or make credibility determinations").

## III.   ARGUMENT

### A.   <u>The Court should deny the EEOC's Motion for Summary Judgment On Abercrombie's Fourth Affirmative Defense, Failure To Mitigate Damages.</u>

A Title VII plaintiff has an obligation to mitigate her damages by seeking alternative

employment with "reasonable diligence."  <u>Caudle v. Bristow Optical Co.</u>, 224 F.3d 1014, 1020

(9th Cir. 2000).  A plaintiff may satisfy the "reasonable diligence" requirement by "demonstrating

a continuing commitment to be a member of the work force and by remaining ready, willing, and

available to accept employment."  <u>Booker v. Taylor Milk</u> Co., 64 F.3d 860, 865 (3d Cir. 1995).

Although a plaintiff's efforts need not be successful, she "must exercise good faith in attempting

to secure a position."  <u>Id.</u>   The alternative employment is suitable if it is "substantially

equivalent."   "Substantially equivalent employment is that employment which affords virtually

identical promotional opportunities, compensation, job responsibilities, and status" as the position

sought.  <u>Sellers v. Delgardo College</u>, 902 F.2d 1189, 1193 (5th Cir. 1990); <u>See</u> <u>Tubari Ltd., Inc.</u>

<u>v. NLRB</u>, 959 F.2d 451 (finding it reasonable for an unskilled worker to have accepted wide

range of work).  "[W]hether a plaintiff has failed to mitigate damages is generally a question of

fact for the jury."  <u>Li v. Sheltzer</u>, 2008 U.S. Dist. LEXIS 103352, *28 (E.D. Ca. 2008).

Here, Banafa's own testimony conclusively demonstrates that she failed to mitigate her

damages.  Banafa applied for a part-time entry level position at Abercrombie which paid

minimum wage, offered virtually no benefits, and required employees to work approximately eight hours per week.  See (Banafa Dep. 84-85; Exh. 19 to EEOC's Motion). After her interview at Abercrombie, Banafa completely discontinued her job search, and failed to make any efforts to get a job for approximately five months.  (Banafa Dep. at 171).   At that point, she moved to South Carolina, applied for work at the Olive Garden, and immediately obtained a job.  (Banafa Dep. at 64, 66).

Banafa's own testimony also demonstrates that there were substantially equivalent jobs available, as prior to stopping her job search, she had applied for open positions at Abercrombie, Fed Ex, and Starbucks.  (Banafa Dep. 74 (Q: What made you apply at Fed Ex? A: They had an open position)). Despite the availability of substantially equivalent work, Banafa failed to exercise reasonable diligence in seeking employment, and therefore, the EEOC's request for summary judgment must be denied.  See EEOC v. Service News Co., 898 F.2d 958, 963 (4th Cir. 1990) (finding unskilled, 18-year-old plaintiff's efforts "insufficient to show mitigation" where Plaintiff presented no evidence that she submitted any applications until five months after termination and only efforts to seek employment were by looking through want ads). See also Sellers v. Delgado College, 902 F. 2d 1189 (finding plaintiff failed to mitigate where she "filed no job applications during six of . . . twelve months"); Oden v. Southern Railroad Co., 1984 U.S. Dist. LEXIS 15358 (N.D. Ga. June 29, 1984)(plaintiff failed to mitigate his damages where he "utterly failed to attempt to secure a position to replace the one he had held").

The EEOC argues that Banafa's failure to seek employment was reasonable when "viewed in light of her individual characteristics and circumstances."  See EEOC's Motion at 23.[4]

---

[4] The EEOC's reliance on EEOC v. Pape Lift, Inc., 115 F.3d 676, 685 (9th Cir. 1997) is misplaced.  In Pape Lift, the plaintiff argued that "his search for comparable employment must be assessed in light of the circumstances of the individual case" and presented evidence that his "lack of aggressiveness" was "common among older workers who are fired from long-term positions."  Pape Lift, Inc., 115 F.3d 676, 685 (9th Cir. 1997).  Here, the record is devoid of any

However, the EEOC has presented no evidence to justify Banafa's *complete failure* to take *any* steps to look for other employment for four months after her interview with Abercrombie.  Given that Banafa indisputably failed to take <u>any</u> steps to look for employment during the four months after her interview with Abercrombie, the EEOC's request for summary judgment must be denied.

### B.   <u>The Court should deny the EEOC's Motion for Summary Judgment on Abercrombie's Eighth Affirmative Defense, Undue Hardship.</u>

#### 1.   <u>The EEOC's Motion should be denied because the EEOC has not, and cannot, establish a prima facie case, and thus the burden has not shifted to Abercrombie to prove undue burden.</u>

Abercrombie's Eighth Affirmative defense relates to the EEOC's reasonable accommodation claim.  In a reasonable accommodation claim, a plaintiff must first establish a *prima facie* case; only <u>then</u> does the burden shift to the defendant to show that it "'initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship.'"  <u>Peterson v. Hewlett-Packard Co.</u>, 358 F.3d 599, 606 (9th Cir. 2004) (*quoting* <u>Tiano v. Dillard Dep't Stores, Inc.</u>, 139 F.3d 679, 681 (9th Cir. 1998).  To establish a *prima facie* case of religious discrimination on the basis of a failure to accommodate, the EEOC must establish that (1) Banafa had a *bona fide* religious belief, the practice of which conflicts with an employment duty; (2) she informed her employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected her to an adverse employment action because of her inability to fulfill the job requirement.  <u>Peterson v. Hewlett-Packard Co.</u>, 358 F.3d 599, 606 (9th Cir. 2004) (citing <u>Heller v. EBB Auto. Co.</u>, 8 F.3d 1433, 1438 (9th Cir. 1993).

The EEOC's Motion on Abercrombie's Eighth Affirmative Defense fails because the

---

evidence to support Banafa's argument that her failure to seek employment for more than four months was "reasonable."

EEOC has not established a prima facie case.  Nor -- for the reasons set forth in Defendant's

Motion for Summary Judgment – could the EEOC establish the third element of its prima facie

case.  See Defendants' Motion, pp. 19-21.

The EEOC is also unable to establish the first element of its prima facie case because

Banafa no longer wears a head scarf at all, and she did not always wear a head scarf in 2008 when

she applied for work at Abercrombie.  (Banafa Dep. 51; Ahmed Banafa Dep. 25; Muschelewicz

Dep. 66-67).    Thus, the EEOC cannot establish that Banafa had a sincerely held religious belief,

and the EEOC certainly cannot establish that element as a matter of law, as is required at the

summary judgment stage.

Thus, the burden has not yet shifted (and will not shift) to Abercrombie to show that it

could not reasonably accommodate Banafa without undue hardship, and summary judgment on

Abercrombie's Eighth Affirmative Defense is improper and should be denied.

**2. Even if the EEOC's Motion were not procedurally improper, it would still fail because there is at least a genuine issue of fact as to whether the accommodation the EEOC seeks for Banafa would have caused an undue hardship on Abercrombie's business.**

To establish undue hardship, an employer need only show that a requested

accommodation would result in "more than a de minimis cost."  Trans World Airlines, Inc. v.

Hardison, 432 U.S. 63, 84 (1977).  The undue hardship threshold is thus "not a difficult threshold

to pass."  Webb v. City of Philadelphia, 562 F.3d 256, 260 (3d Cir. 2009).

Moreover, employers are not required to prove undue hardship with exactitude.  See Cook

v. Chrysler, 981 F.2d 336, 339 (8th Cir. 1992) (finding that "costs, although not ascertained with

exactitude, were present and real").  In fact, some courts have found undue hardship where the

harm was speculative.  EEOC v. The GEO Group, Inc., 616 F.3d 265 (3d Cir. 2010) (finding

undue hardship where defendant presented testimony from employee with "significant prior

experience" and "practical experience" in the field who opined as to harm that could result from

accommodation).  Additionally, an employer need not establish an economic harm in order to prove undue hardship.  See Webb, 562 F.3d at 260  ("Both economic and non-economic costs can pose an undue hardship upon employers; the latter category includes, for example, violations of the seniority provision of a collective bargaining agreement and the threat of possible criminal sanctions."); Beadle v. City of Tampa, 42 F.3d 633, 636 (11th Cir. 1995) ("The Court has also recognized that the phrase 'de minimis cost' entails not only monetary concerns, but also the employer's burden in conducting its business."); Sanchez-Rodriguez v. AT&T Wireless, 728 F. Supp.2d 31, 42 (D.P.R. 2010) (compromising scheduling system intended to accommodate shift preferences of employees constituted undue hardship).

The Tenth Circuit has stated that "undue hardship" and "reasonably accommodate" are "relative terms and cannot be given any hard and fast meaning."  U.S. v. City of Albuquerque, 545 F.2d 110, 114 (10th Cir. 1976).  See also Yott v. North American Rockwell Corp., 602 F.2d 904 (9th Cir. 1979) ("The term 'reasonable accommodation' is a relative term and cannot be given a hard and fast meaning."). Thus, whether an employer acted reasonably is a fact-intensive inquiry that depends on the facts and circumstances of the individual case.  Id.;  Cross v. Bailer, 477 F. Supp. 748, (D. Or. 1979) (standards governing "reasonable" accommodation and "undue" hardship . . . [t]o a great extent . . . can be determined only within the context of the facts of each case").  Drazewski v. Waukegan Dev. Center, 651 F. Supp. 754, 760 (N.D. Ill. 1986); Harrell v. Donahue, 638 F.3d 975, 979 (8th Cir. 2011) ("Determinations of what constitutes an 'undue hardship' must be made on a case-by-case basis."); EEOC v. Aldi, Inc., No. 06-01210, 2009 U.S. Dist. LEXIS 91554, at *43-44 (W.D. Pa. Sep. 30, 2009) (unpublished) (whether requested accommodation is undue hardship is fact-intensive inquiry that rests on "particular factual context of each case . . . the magnitude as well as the fact of hardship must be determined by the examination of the facts of each case") (internal citations omitted); Prach v. Hollywood

Supermarket, Inc., No. 09-13756, 2010 U.S. Dist. LEXIS 88738 (E.D. Mich. Aug. 27, 2010) (unpublished) ("the reasonableness of an accommodation is determined on a case-by-case basis according to the facts as they existed at the time of the plaintiff's employment").  A fact-intensive determination such as that required to determine undue burden is best left to a well-instructed jury.  Aldi, 2009 U.S. Dist. LEXIS 91554, at *44.

Here, Abercrombie has identified two types of undue hardship that would have occurred had Banafa been permitted to wear a head scarf to work.  First, because a head scarf is indisputably and obviously inconsistent with the type of clothing Abercrombie sells and the Abercrombie brand, the head scarf would have disrupted Abercrombie's careful branding efforts. (Chmielewski Dep. 152; Riley-Tulsa Dep. 106).  Abercrombie advertises and communicates its brand identity virtually exclusively through its in-store experience.  (Riley-Tulsa Dep. 31-32). The clothing that an employee wears in the store is critical to the in-store experience.  (Riley-Tulsa Dep. 29, 77, 106).  Employees are expected to wear clothing that is consistent with the Abercrombie brand, and no one is permitted to wear clothing that will obviously distract from the Abercrombie brand.  (Riley-Tulsa Dep. 77).  Abercrombie's Look Policy plays a critical role in communicating the overall brand experience and desired brand image to customers because it ensures consistent and positive portrayals of the Abercrombie brand in the all-important in-store environment.  (Moorefield-Tulsa Dep. 138, 208; Riley-Tulsa Dep. 130).  Abercrombie carefully monitors compliance with the Look Policy through a variety of means, including regular store audits and secret shopper reports.  (Chmielewski 87-88; Moorefield-Tulsa Dep. 180-181, 183-185, 199-202).  Numerous representatives of Abercrombie have testified that compliance with the Look Policy is critical to Abercrombie's business, and non-compliance with the Look Policy is harmful to Abercrombie's business.  (Riley-Tulsa Dep. 15; 96-97, 107 ("deviations from the policy or from our standards over all could have a negative impact on our brands.") ("it goes back

to our core strategy, which is we provide an in-store experience for the customer which is what our brand thrives on and is how we remain successful") ("I believe in our core business strategy, which is adherence to The Look Policy contributes greatly to the in-store customer experience.  I believe that any exceptions that we make need to ensure that we do not, in any way, take away from the in-store experience."); Moorefield-Tulsa Dep. 218, 226-227, 240, 268 ("I have seen stores or managers that do a poor job of enforcing our look Policy and have seen low sales scores because of it") ("It's a core belief that any deviation from The Look Policy has a negative impact on business"); Chmielewski Dep. 60-62, 152, 200 (describing negative impact (deviation [from the Look Policy] would have an impact on our business . . . our in-store experience is our advertising.  Our in-store associates represent the brand.  If they are not doing that, customers don't have a clear picture of what our brand is.  Sales would suffer, people would be confused about the brand and certainly our sales would be hurt by that.") ("a violation of The Look Policy damages the brand) (describing instance where "sales increased dramatically" when Look Policy compliance improved) ("The appearance, style of our associates is the first thing that somebody sees that's representative of our brand.  And if it's not representative of our brand, they become confused . . . they may leave the store with the wrong impression of our brand . . . and cause a downstream effect of our brand being damaged."))

Courts have found undue hardship where an employer alleges that the requested accommodation will damage the company's public image or reputation, and several courts have held that accommodations which amount to exceptions from neutral dress policies create an undue hardship.  See EEOC v. Kelly Services, Inc., 598 F.3d 1022, 1029 (8th Cir. 2010) (undue hardship to allow exception to dress policy prohibiting head coverings); Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 135 (1st Cir. 2004) (granting request for exemption from dress policy would damage public image, resulting in undue hardship); Webb, 562 F.3d at 261-62

(permitting dress code violation that would alter neutrality of dress code amounted to undue

hardship); Daniels v. City of Arlington, 246 F.3d 500, 506 (5th Cir. 2001) (undue hardship to

permit exception to neutral dress code for employee to wear religious pin); Hussein v. The

Waldorf-Astoria, 134 F. Supp.2d 591, 598 (S.D.N.Y. 2001) (damage to company's reputation).

Here, there is no dispute that a head scarf is obviously inconsistent with the Abercrombie brand.

Allowing an employee to wear a head scarf to work thus distracts from the brand, and causes

more than a de minimis hardship to Abercrombie's business.

Allowing exceptions to the Look Policy also dilutes Abercrombie's ability to uniformly

enforce the Look Policy.  (Passalacqua-St. Louis Dep. 22-23, 61, 63-64 ("because one person

wore [competitor logo], another one that that would be okay as well" requiring company to "get

in front of what we would call a chain reaction and associates not adhering to the Look Policy").

It is axiomatic that allowing one exception to a policy breeds more requests for exceptions.

Indeed, the EEOC's primary argument in this case is that Abercrombie must allow still further

exceptions to its Look Policy because it has occasionally allowed some non-distracting

exceptions in the past.  See EEOC Motion, pp. 22-23.  Courts have held that forfeiting the ability

to uniformly enforce a neutral policy can constitute an undue burden.  See e.g., Cloutier, 390 F.3d

at 137 (employer who allows employees to violate dress policy "forfeits its ability to mandate

compliance and thus loses control over its public image."); Sanchez-Rodriguez, 728 F. Supp.2d at

43 (undermining a neutral scheduling system can constitute undue hardship).  Here,

noncompliance with the Look Policy interferes with Abercrombie's enforcement of the Policy

and negatively affects its ability to control the brand and enforce its policy, resulting in an undue

hardship.

At the very least, Abercrombie has submitted sufficient evidence of undue hardship to

raise a genuine issue of fact preventing summary judgment.

### 3.   <u>Accommodations made by Abercrombie relating to the Look Policy do not foreclose Abercrombie from proving undue hardship.</u>

The EEOC's primary argument is essentially that Abercrombie is foreclosed from arguing undue hardship in any case because it has voluntarily made occasional exceptions to the Look Policy.

Initially, the EEOC's argument creates a disincentive for employers to grant any requests for accommodation out of fear that once granted in one case anywhere in the country, the employer will be barred from asserting the existence of undue hardship in any other case.  The EEOC essentially seeks to punish Abercrombie for making accommodations by using them to deprive Abercrombie of the ability to argue that the accommodation sought by the EEOC in this case constituted an undue hardship.  This is contrary to Title VII policy and should not be permitted.  See <u>Myers v. Hose</u>, 50 F.3d 278, 284 (4th Cir. 1995) (employer not required to extend to additional employees accommodations previously granted in good faith because such a requirement would "discourage employers from treating" employees seeking an accommodation "in a spirit that exceeds the mandates of federal law"); <u>Vande Zande v. Wisconsin Dep't. of Admin.</u>, 44 F.3d 538, 545 (7th Cir. 1995) (employer must not be punished for going further than law requires to accommodate employee by "being deemed to have conceded the reasonableness of an accommodation"); <u>Smith v. Ameritech</u>, 129 F.3d 857, 868 (6th Cir. 1997) (providing certain accommodation for one employee does not automatically entitle plaintiff to same accommodation).

Moreover, it is well-settled that an employer's duty to accommodate is judged on a case by case basis, under the circumstances that exist as to each particular request for accommodation. <u>Toledo v. Nobel-Sysco, Inc.</u>, 892 F.2d 1481, 1492 (10th Cir. 1989) (quoting <u>Tooley v. Martin-Marrietta Corp.</u>, 648 F.2d 1239, 1243 (9th Cir. 1981)) ("'[t]he *magnitude* as well as the *fact* of hardship must be determined by <u>examination of the facts of each case</u>.'") (underline emphasis

added).   The fact that accommodations were made in one set of circumstances does not dictate

that accommodations must be made in all sets of circumstances.  See Walker v. Alcoa, Inc., No.

4:06-CV-120-JVB, 2008 U.S. Dist. LEXIS 45684, *38 (N.D. Ind. Jun. 9, 2008) (unpublished)

(finding that evidence that requested accommodation was provided for two other employees who

were not similarly situated to plaintiff served only to further illustrate fact that questions of fact

existed as to whether proposed accommodation created undue burden).  The vast bulk of

accommodations made by Abercrombie were determined not to be distracting from the brand

because they were either not noticeable, or were barely noticeable.  (Riley-Tulsa Dep. 162-163;

(necklace worn for religious reasons permitted where "dainty and not noticeable"); 166

(accommodation granted for bracelet because "barely noticeable"); 180 (accommodation for nose

spacer granted because "not noticeable"); 232 (accommodation approved for yamaka that is

"discrete" and blended with employee's hair color)).

Finally, the EEOC makes much of Abercrombie's later decision to allow accommodations

for headscarves.  The EEOC, however, conducts no analysis to determine whether the employees

offered the post-facto accommodations were similarly situated to Banafa.  They were not.  The

post-facto accommodations were offered two years after Banafa was interviewed,[5] in different

stores, and under different circumstances.  Moreover, the undisputed evidence was that

Abercrombie offered the accommodations despite the undue hardship caused in order to avoid

continued threatened litigation – a consideration that was not present when Banafa applied for

employment.  The post-facto accommodations are not relevant to Banafa's case and thus are of

questionable admissibility.  They certainly are not dispositive.

---

[5] This distance in time alone is sufficient to distinguish the post-facto accommodations from Banafa's
situation.  Prach v. Hollywood Supermarket, Inc., No. 09-13756, 2010 U.S. Dist. LEXIS 88738, at
*14 (E.D. Mich. Aug. 27, 2010) (unpublished) ("the reasonableness of an accommodation is
determined on a case-by-case basis according to the facts as they existed at the time of the plaintiff's
employment").

**4.  The EEOC's other arguments lack merit.**

The EEOC heavily argues that Abercrombie has never conducted an empirical study to determine whether exceptions to the Look Policy negatively affect sales.  See EEOC's Motion, p. 10, 20-21.  At the outset, that argument fails because the case law is clear: employers need not demonstrate economic harm in order to demonstrate undue hardship, nor need employers measure undue hardship with exactitude.  Webb, 562 F.3d at 260  ("Both economic and non-economic costs can pose an undue hardship upon employers; the latter category includes, for example, violations of the seniority provision of a collective bargaining agreement and the threat of possible criminal sanctions."); Beadle v. City of Tampa, 42 F.3d 633, 636 (11th Cir. 1995) ("The Court has also recognized that the phrase '*de minimis* cost' entails not only monetary concerns, but also the employer's burden in conducting its business."); Cook v. Chrysler, 981 F.2d 336, 339 (8th Cir. 1992 (finding that "costs, although not ascertained with exactitude, were present and real").  Although the EEOC is correct that Abercrombie has not conducted an empirical study to determine whether exceptions to the Look Policy negatively affect sales, the EEOC's argument fails because the law never required Abercrombie to do so.

Additionally, the EEOC's argument ignores the testimony of numerous Abercrombie executives and employees that have linked poor sales results to stores with poor Look Policy compliance. (Moorefield-Tulsa Dep. 198, 200, 202, 208, 212-213; Chmielewski Dep. 60-62, 200 ("Our in-store associates represent the brand".  If they are not doing that, customers don't have a clear picture of what our brand is.  Sales would suffer, people would be confused about the brand and certainly our sales would be hurt by that.") ("one particular store that I took over had . . . a lot of Look Policy issues.  Through training, coaching, development of managers, and . . . the associates in the stores . . . sales increased dramatically") ("The appearance, style of our associates is the first thing that somebody sees that's representative of our brand.  And if it's not

representative of our brand, they become confused . . . they may leave the store with the wrong impression of our brand . . . and cause a downstream effect of our brand being damaged.")) The EEOC's testimony also ignores testimony that the primary undue hardship caused by Look Policy violations is not necessarily an immediate drop off of sales, but rather the dilution, dampening and weakening of the <u>brand</u>. (Passalacqua-St. Louis Dep. 32-34, 42-43 ("we draw a correlation between Look Policy and brand experience as most important")). At a minimum, this testimony raises a genuine issue of fact preventing summary judgment.

### 5. The Oklahoma Decision has been appealed.

The EEOC's Motion heavily argues that Abercrombie's undue burden defense was rejected by the Northern District of Oklahoma in <u>EEOC v. Abercrombie & Fitch Stores, Inc.</u>, 798 F. Supp.2d 1272 (N.D. Okla. 2011). Stunningly, however, the EEOC's Motion fails to inform this Court that the Oklahoma decision has been appealed to the Tenth Circuit Court of Appeals, the appeal is fully briefed, and oral argument occurred on May 7, 2012. Because the EEOC argues that the Oklahoma decision has bearing on the instant case, Abercrombie respectfully suggests that the Court delay issuing a decision until the Tenth Circuit Court of Appeals has had a chance to weigh in.

### C. The Court should deny the EEOC's Motion for Summary Judgment on Abercrombie's Tenth Affirmative Defense, Infringement of Commercial Free Speech.

#### 1. Abercrombie Engages in Protected Speech to Advertise Its Brand.

As explained above, Abercrombie does not engage in traditional print, TV, or radio advertising to communicate its brand image to consumers. <u>See</u>, <u>supra</u>, Section I.B. Rather, Abercrombie promotes its products in a unique way by creating an "in-store experience" for its customers that advertises Abercrombie's vision of its brand. <u>Id.</u> The in-store employees promote Abercrombie's brand image through their appearance, words and demeanor. <u>Id.</u> The

combination of the in-store environment with the appearance and demeanor of employees is

Abercrombie's primary form of promoting its products.  Id.  By promoting its products through

the in-store experience, Abercrombie obtains a competitive advantage over competitors that rely

on more traditional means of advertisement.  Id.

In its 10-K filed with the Securities and Exchange Commission, Abercrombie described

its in-store advertising as follows:

> *In-Store Experience and Store Operations.*
>
> The Company views the customer's in-store experience as the primary vehicle for communicating the spirit of each brand. The Company emphasizes the senses of sight, sound, smell, touch and energy by utilizing visual presentation of merchandise, in-store marketing, music, fragrances, rich fabrics and its sales associates to reinforce the aspirational lifestyles represented by the brands.
>
> The Company's in-store marketing is designed to convey the principal elements and personality of each brand.  The store design, furniture, fixtures and music are all carefully planned and coordinated to create a shopping experience that reflects the Abercrombie & Fitch, abercrombie kids, Hollister or Gilly Hicks lifestyle.
>
> The Company's sales associates, and managers are a central element in creating the atmosphere of the stores. In   addition to providing a high level of customer service, sales associates and managers reflect the casual, energetic and aspirational attitude of the brands.

See Stilp Decl. Exh. M.

### 2.  Compelling Abercrombie to Advertise a Style or Fashion Which Is Inconsistent With Its Brand Violates the First Amendment.

Commercial speech such as advertising is a protected form of speech under the First

Amendment to the United States Constitution.  Virginia State Board of Pharmacy v. Virginia

Citizens Consumer Council, 425 U.S. 748, 762 (1972) (recognizing that speech that does "no

more than propose a commercial transaction" is protected).  Protected speech is not limited to

verbal or written words; expressive or symbolic conduct is also entitled to protection.  Hurley v.

Irish Am. Gay, Lesbian & Bisexual Grp. Of Boston, 515 U.S. 557, 569 (1995).

The protection of "the First Amendment against state action includes both the right to

speak freely and the right to refrain from speaking at all." <u>Wooley v. Maynard</u>, 430 U.S. 705, 714 (1976). A speaker "has the autonomy to choose the content of his own message." <u>Hurley</u>, 515 U.S. at 573-574. "For corporations as for individuals, the choice to speak includes within it the choice what not to say." <u>Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.</u>, 475 U.S. 1, 16 (1986) (plurality opinion) (rejecting argument that government may compel speech from corporations). Any statute requiring speech "that a speaker would not otherwise make" necessarily "alters the content of the speech." <u>Riley v. Nat'l. Fed'n of the Blind of N.C., Inc.</u>, 487 U.S. 781, 795 (1988).

In the context of commercial speech, the state may in some circumstances regulate commercial advertising by compelling the disclosure of "purely factual and uncontroversial information." <u>Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio</u>, 471 U.S. 626, 651 (1985). Outside of that narrow context the State "may not compel affirmance of a belief with which the speaker disagrees" or "would rather avoid." <u>Hurley</u>, 515 U.S. at 573. Compelled speech is "presumptively unconstitutional." <u>R.J. Reynolds Tobacco Co. v. United States FDA</u>, 823 F. Supp.2d 36, 45 (D.D.C. 2011).

Abercrombie has established that it utilizes the appearance of its in-store employees to promote and advertise Abercrombie's style and brand image. <u>See</u>, <u>supra</u>, Section I.B. Just as a TV or print advertisement, this in-store advertising is protected by the First Amendment. In this case, the government, through an application of Title VII, seeks to compel Abercrombie to include in its in-store advertisements an employee wearing a hijab. Surely, a fashion retailer has the ability to select the type of fashion it wishes to advertise or not advertise. If Abercrombie's advertisement was done through a print advertisement, the government could not compel Abercrombie to include models wearing a fashion style that was inconsistent with the fashion style Abercrombie sold. <u>Miami Herald Pub. Co. v. Tornillo</u>, 418 U.S. 241, 258 (statute requiring

newspapers to publish dissenting opinions held unconstitutional).  The only distinction in this case is that rather than a print advertisement, Abercrombie's speech is conveyed through an in-person advertisement – the in-store experience.

A head scarf is inconsistent with Abercrombie's brand, and indeed represents a specific style of fashion that competes with Abercrombie's brand.[6]  Any style of dress that is inconsistent with Abercrombie's style of clothing detracts from Abercrombie's in-store experience, and thus from the way that Abercrombie promotes and advertises its products, by distracting from the intended message and confusing consumers.  Compelling Abercrombie to advertise a fashion style that is inconsistent with its own style (and which in fact competes with the Abercrombie style) violates the First Amendment.

The EEOC's Motion argues that Title VII has survived constitutional challenges and is not unconstitutional.  (EEOC's Mot. at 32:1-5).  In support of this proposition, the EEOC cites Tooley v. Martin Marietta Corp., 648 F. 2d 1239 (9th Cir. 1981).  Id.  However, Tooley is an Establishment clause case; it is irrelevant to Abercrombie's compelled speech argument. Moreover, Abercrombie has not argued that Title VII is unconstitutional.  The constitutional problem only arises through the EEOC's enforcement of Title VII in this case.

In Hurley, supra, the petitioners challenged the application of Massachusetts' public accommodation statute which prohibited discrimination on the basis of sexual orientation.  See Hurley, 515 U.S. at 561.  The petitioners in Hurley organized an annual St. Patrick's Day parade. Id.  The parade organizers argued that the public accommodation statute could not be enforced to require the organizers to include a group of gays and lesbians of Irish descent in the parade because their parade was a form of speech and they could not be compelled under the First

---

[6] Dr. Kathleen Moore, an expert on Islam retained by the EEOC, testified that Islamic forms of dress, such as a head scarf, have become a fashion trend, and noted that fashion shows marketing Islamic styles of dress have taken place in Santa Clara, California – only miles from the Milpitas store at which Banafa applied.  (Moore Dep. p. 67-69, Exh. 2).

Amendment to include a form of speech with which they disagreed.  Id.  In a unanimous opinion, the Supreme Court ruled in favor of the parade organizers and held that the application of the public accommodation statute had the effect of compelling parade organizers to include in their parade a form a speech with which they did not agree in violation of their First Amendment rights.  Id. at 575.

The petitioners in Hurley did not contend that the statute requiring public accommodation was unconstitutional.  The Court noted that "as a general matter" the public accommodation statute does not violate the First Amendment.  Id. at 572.   However, when the public accommodation statute was applied in a manner where the accommodation sought had the effect of compelling the parade organizers to engage in a form of speech, it violated the First Amendment.  Id.  at 573.  Similarly, Abercrombie does not contend that Title VII's religious accommodation requirement is unconstitutional.  But when here, as in Hurley, the accommodation sought by the EEOC has the effect of compelling Abercrombie to advertise a style of fashion other than its own, Abercrombie's First Amendment rights are violated.

The EEOC also argues that the Court should apply the Central Hudson test to this case.  (Opposition p. 31:18-24).  Central Hudson addresses the limitations on the government's ability to restrict or prohibit commercial speech.  Cent. Hudson Gas & Elecl. Corp. v. Public Serv. Comm'n, 447 U.S. 557 (1980) (rejecting prohibition of advertisements by utilities that encouraged electricity consumption).  While Central Hudson confirms that Abercrombie's commercial speech is entitled to First Amendment protection, the four part test detailed in Central Hudson is inapplicable to this case because the EEOC does not seek to restrict Abercrombie's speech; rather, the EEOC seeks to compel Abercrombie to speak.  The authorities relevant to a compelled speech case are those set forth above, including Hurley, Wooley, and Pacific Gas and Electric.  Applying these relevant authorities, the EEOC has not demonstrated an entitlement to

1  summary judgment.

2       As a result, the EEOC's Motion as to Abercrombie Tenth Affirmative Defense should be

3  denied.

4            **D.  Abercrombie agrees to withdraw its Fifth and Sixth Affirmative Defenses.**

5       Abercrombie hereby agrees to withdraw its Fifth Affirmative Defense (waiver, estoppel,

6  unclean hands, and laches) and its Sixth Affirmative Defense (failure to exhaust administrative

7  remedies.

8

9  **IV.     CONCLUSION**

10      Based on the foregoing facts and authorities, the Court should deny the EEOC's Motion

11 for Partial Summary Judgment as to Abercrombie's Fourth, Eighth, and Tenth Affirmative

12 Defenses.

13

14 Dated:  September 7, 2012          Respectfully submitted,

15                                    /s/Mark A. Knueve
16                                    Mark A. Knueve (Ohio Bar No. 0067074)
                                      Daniel J. Clark (Ohio Bar No. 0075125)
17                                    Samantha A. Stilp (Ohio Bar No. 0086907)
                                      VORYS, SATER, SEYMOUR AND PEASE LLP
18                                    52 East Gay Street
                                      P.O. Box 1008
19                                    Columbus, Ohio 43216-1008
                                      Telephone: (614) 464-6387
20                                    Facsimile: (614) 719-4808
                                      E-mail: maknueve@vorys.com
21                                    E-mail: djclark@vorys.com
                                      E-mail: sastilp@vorys.com
22
                                      *Admitted pro hac vice*
23
                                      Douglas E. Dexter, SBN 115868
24                                    FARELLA BRAUN + MARTEL LLP
                                      235 Montgomery Street, 17th Floor
25                                    San Francisco, CA 94104
                                      Telephone: (415) 954-4400
26                                    Facsimile: (415) 954-4480
                                      E-mail: ddexter@fbm.com
27
                                      Attorneys for Defendant
28                                    ABERCROMBIE & FITCH STORES, INC.
                                      d/b/a ABERCROMBIE KIDS

1

## **CERTIFICATE OF SERVICE**

2

3

The undersigned hereby certifies that a true and accurate copy of the foregoing

4

Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, has been

5

electronically filed with the Clerk of the Court through the CM/ECF system, which will send

6

notice of electronic filing to the CM/ECF participants on this 7th day of September 2012.

7

8

/s/Samantha A. Stilp
Samantha A. Stilp

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28